Debtor Name     232 Seigel Development LLC

United States Bankruptcy Court for the:  Southern     District of   New York
                                                                (State)

Case number:   20-22844

❑ Check if this is an amended filing

## Official Form 425A

# Plan of Reorganization for Small Business Under Chapter 11     12/17

232 Seigel Development LLC   's **Plan of Reorganization, Dated** August 17, 2020

### Article 1: Summary

This Plan of Reorganization (the "Plan") under chapter 11 of the Bankruptcy Code (the "Code") proposes to pay creditors of 232 Seigel Development LLC (the "Debtor") from the proceeds of sale of the real property owned by the Debtor's subsidiary, 232 Seigle Acquisition, LLC, at 232 Seigel Street, Brooklyn, New York.

This Plan provides for:

| | |
|---|---|
| 1 | class of priority claims; |
| 1 | class of secured claims; |
| 1 | class of non-priority unsecured clams; and |
| 1 | class of equity security holders. |

Non-priority unsecured creditors holding allowed claims will receive distributions, which the proponent of this Plan has valued at approximately100 cents on the dollar. This Plan also provides for the payment of administrative and priority claims.

All creditors and equity security holders should refer to Articles 3 through 6 of this Plan for information regarding the precise treatment of their claim.  **Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

### Article 2: Classification of Claims and Interests

2.01   **Class 1** ...............................  All allowed claims entitled to priority under § 507(a) of the Code (except administrative expense claims under § 507(a)(2), ["gap" period claims in an involuntary case under § 507(a)(3),] and priority tax claims under § 507(a)(8)).

2.02   **Class 2** ..................................  The claim of   DB 232 Seigel Mezz LLC   , to the extent allowed as a secured claim under § 506 of the Code.

2.03   **Class 3** ..................................  All non-priority unsecured claims allowed under § 502 of the Code.

2.04   **Class 4** ..............................  Equity interests of the Debtor.

## Article 3: Treatment of Administrative Expense Claims, Priority Tax Claims, and Quarterly and Court Fees

| | | |
|---|---|---|
| 3.01 | **Unclassified claims** | Under section § 1123(a)(1), administrative expense claims, and priority tax claims are not in classes. |
| 3.02 | **Administrative expense claims** | Each holder of an administrative expense claim allowed under § 503 of the Co̊^Á ¸ã||Á̊â^Áᾱâã/Ā̃ Á̈ ̈ ||Á̧ } Á̊c@·Á̂ˆ—^&c̊ã̊^/Á̊àæ^Á̧ -Á̊c@̃ãÁ̊U|à}Éã̊ /&æ̃ @É̊Á̧ ¦Á̊ ] [ } Á̊^ˆ&@Á̧ c@·¦Á c^¦{ •Á̊æ̃ Á̧ âã̊Á̊ᾱ^Áæ̃ ¦^^â̊Á̊ ] [ } Á̊ā^Á̊c@·ÁᾱÁ̊|à^¦Á̧ -Á̊c@·Á̊&|æã̊ Á̧ æ̊à Á̊àᾱ/c@·ÁŬ^Á̊à̧ ¦È |
| 3.03 | **Priority tax claims** | Each holder of a priority tax claim will be paid in full on the effective date of this Plan, consistent with § 1129(a)(9)(C) of the Code. |
| 3.04 | **Statutory fees** | All fees required to be paid under 28 U.S.C. § 1930 that are owed on or before the effective date of this Plan have been paid or will be paid on the effective date. |
| 3.05 | **Prospective quarterly fees** | All quarterly fees required to be paid under 28 U.S.C. § 1930(a)(6) or (a)(7) will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code. |

## Article 4: Treatment of Claims and Interests Under the Plan

**4.01  Claims and interests shall be treated as follows under this Plan:**

| Class | Impairment | | Treatment |
|---|---|---|---|
| Class 1 - **Priority claims** excluding those in Article 3 | ☐ Impaired ☒ Unimpaired | | Class 1 is unimpaired by this Plan. Each holder of a Class 1 priority claim will be paid in full, in cash, upon the later of the effective date of this Plan, or the date on which such claim is allowed by final non-appealable order. |
| Class 2  **Secured claim** of DB 232 Seigel Mezz LLC | ☒ Impaired ☐ Unimpaired | | Class 2 is impaired by this Plan.  The Class 2 Claimant shall be paid the sale proceeds the Debtor receives from the sale of the Property under the Acquisition plan up to the allowed amount of its claim, upon the later of the effective date of this Plan, or the date on which such claim is allowed by final non-appealable order. |
| Class 3  **Non-priority unsecured creditors** | ☒ Impaired ☐ Unimpaired | | Class 3 is impaired by this Plan.  Each Class 3 Claimant shall be paid its pro-rata share of the sale proceeds the Debtor receives from the sale of the Property under the Acquisition plan after payment of administrative claims, priority tax claims, class 1 priority claims, and the class 2 Secured claim, up to the allowed amount of its claim, upon the later of the effective date of this Plan, or the date on which such claim is allowed by final non-appealable order. |
| Class 4 - **Equity security holders of the Debtor** | ☒ Impaired ☐ Unimpaired | | Class 4 is impaired by this Plan.  Each Class 4 equity security holder shall be paid its pro-rata share of the sale proceeds the Debtor receives from the sale of the Property under the Acquisition plan after payment administrative claims, priority tax claims, class 1 priority claims, the class 2 Secured claim, and class 3 non priority unsecured creditors, up to the allowed amount of its interest, upon the later of the effective date of this Plan, or the date on which such interest is allowed by final non-appealable order. |

## Article 5: Allowance and Disallowance of Claims

| | | |
|---|---|---|
| 5.01 | **Disputed claim** | A *disputed claim* is a claim that has not been allowed or disallowed by a final non-appealable order, and as to which either:<br><br>(i)  a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or<br><br>(ii)  no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated. |
| 5.02 | **Delay of distribution on a disputed claim** | No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order. |

| 5.03 | **Settlement of disputed claims** | The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure. |
|---|---|---|

## Article 6: Provisions for Executory Contracts and Unexpired Leases

| 6.01 | **Assumed executory contracts and unexpired leases** | (a) The Debtor assumes, and if applicable assigns, the following executory contracts and unexpired leases as of the effective date: None |
|---|---|---|
| | | (b) Except for executory contracts and unexpired leases that have been assumed, and if applicable assigned, before the effective date or under section 6.01(a) of this Plan, or that are the subject of a pending motion to assume, and if applicable assign, the Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases as of the effective date.

A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than  thirty  days after the date of the order confirming this Plan. |

## Article 7: Means for Implementation of the Plan

The Debtor is the sole member of 232 Seigel Acquistion LLC ("Acquisition"), which filed a related Chapter 11 petition. Acquisition owns the real property ("Property") at 232 Seigel Street, Brooklyn, New York.  Payments under this Plan will be made from the proceeds of sale of the Property after payment of Acquisition's creditors, under Acquisition's Chapter 11 plan, a copy of which is annexed hereto.

## Article 8: General Provisions

| 8.01 | **Definitions and rules of construction** | The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan, and they are supplemented by the following definitions: "Acquisition" shall mean 232 Seigel Acquistion LLC; "Debtor" shall mean 232 Seigel Development LLC, and "Property" shall  mean  232 Seigel Street, Brooklyn, New York. |
|---|---|---|
| 8.02 | **Effective date** | The effective date of this Plan is the first business day following the sale of the Property under the Acquisition Chapter 11 plan. If, however, a stay of the confirmation order in this case or the confirmation order in the Acquisition case is in effect on that date, the effective date will be the first business day after the date on which such stay expires or is otherwise terminated. |
| 8.03 | **Severability** | If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan. |
| 8.04 | **Binding effect** | The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity. |
| 8.05 | **Captions** | The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan. |

| [8.06 | **Controlling effect** | Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of New York govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan. |

| [8.07 | **Corporate governance** | The Plan has no provisions required by § 1123(a)(6) of the Bankruptcy Code. |

| [8.08 | **Retention of Jurisdiction** | The Court shall have jurisdiction over all matters arising under, arising in, or relating to the Debtor's Bankruptcy Case |

## Article 9: Discharge

Check one box.

9.01  ☐    **Discharge if the Debtor is an individual and § 1141(d)(3) is not applicable.** Confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments under this Plan, or as otherwise provided in § 1141(d)(5) of the Code. The Debtor will not be discharged from any debt excepted from discharge under § 523 of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

☐    **Discharge if the Debtor is a partnership and § 1141(d)(3) is not applicable.** On the effective date of this Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code. The Debtor will not be discharged from any debt imposed by this Plan.

☐    **Discharge if the Debtor is a corporation and § 1141(d)(3) is not applicable.** On the effective date of this Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt:

   (i)   imposed by this Plan; or

   (ii)  to the extent provided in § 1141(d)(6).

☒    **No discharge if § 1141(d)(3) is applicable.** In accordance with § 1141(d)(3) of the Code, the Debtor will not receive any discharge of debt in this bankruptcy case.

---

**Article 10: Other Provisions**

[Insert other provisions, as applicable.]

Respectfully submitted,

✖ s/David Goldwasser, Authorized Signatory        David Goldwasser, Authorized Signatory

[Signature of the Plan Proponent]                 [Printed Name]

✖ _____                _____

[Signature of the Attorney for the Plan Proponent]   [Printed Name]

Mark Frankel
Backenroth Frankel & Krinsky, LLP
800 Third Avenue, Floor 11
New York, New York 10022
(212) 593-1100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re                                                           Chapter 11

      232 Seigel Acquisition LLC                     Case no. 20-22845

                      Debtor.
-----------------------------------------------------------------x

## DISCLOSURE STATEMENT

**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED TO ALL CREDITORS AND PARTIES IN INTEREST OF 232 SEIGEL ACQUISTION. (THE "DEBTOR").**

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY AFFECT CREDITORS' DECISIONS TO ACCEPT OR REJECT THE PLAN OF REORGANIZATION, A COPY OF WHICH IS ANNEXED HERETO AS EXHIBIT A.**

**ALL CREDITORS ARE URGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY. ALL CAPITALIZED TERMS CONTAINED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE SAME MEANING AS CAPITALIZED TERMS CONTAINED IN THE PLAN OF REORGANIZATION.**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

# INTRODUCTION

1.       232 Seigel Acquisition LLC (the "Debtor"), submits this disclosure statement ("Disclosure Statement") in connection with its plan of reorganization ("Plan") under Chapter 11 of the United States Bankruptcy Code.  A copy of the Plan is attached hereto as Exhibit A.  All Creditors are urged to review the Plan, in addition to reviewing this Disclosure Statement.  All capitalized terms used but not defined shall have the meaning set forth in the Plan.

2.       This Disclosure Statement is not intended to replace a review and analysis of the Plan.  Rather, it is submitted as a review of the Plan in an effort to explain the Plan.  To the extent a Creditor has questions, the Debtor urges you to contact Debtor's counsel and every effort will be made to assist you.

1.       On _____, 2020, after notice and a hearing, the Bankruptcy Court entered an order approving this Disclosure Statement as containing information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition of the Debtor's books and records, to enable Creditors to make an informed judgment on the Plan.

2.       EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT, NO REPRESENTATIONS CONCERNING THE DEBTOR, ITS ASSETS, ITS PAST OR FUTURE OPERATIONS, OR THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN.

3.     THE INFORMATION CONTAINED IN THIS DISCLOSURE
STATEMENT HAS BEEN SUPPLIED BY THE DEBTOR.  THE DEBTOR'S BOOKS AND
RECORDS HAVE BEEN USED TO PROVIDE THE INFORMATION CONCERNING THE
DEBTOR'S FINANCIAL CONDITION AS SET FORTH IN THE DISCLOSURE
STATEMENT.  BASED UPON THE INFORMATION MADE AVAILABLE, DEBTOR'S
COUNSEL HAS NO INFORMATION TO INDICATE THAT THE INFORMATION
DISCLOSED HEREIN IS INACCURATE.  NEITHER THE DEBTOR NOR DEBTOR'S
COUNSEL, HOWEVER, IS ABLE TO STATE DEFINITIVELY THAT THERE IS NO
INACCURACY HEREIN OR THAT FUTURE EVENTS MAY NOT RENDER THE
INFORMATION CONTAINED HEREIN INACCURATE.

4.     The Bankruptcy Court has entered an Order fixing _____,
2020, at ___.m., at the United States Bankruptcy Court, 300 Quarropas Street, White Plains, NY
10601−5008, as the date, time and place for the hearing on confirmation of the Plan, and fixing
_____, 2020, at 5:00 p.m. as the last date for voting and for the filing of any
objections to confirmation of the Plan.

## BACKGROUND

5.     On July 14, 2020, the Debtor filed a Chapter 11 petition under Title 11 of
the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code").  On the same day, 232
Seigel Development LLC ("232 Development"), the Debtor's parent company, filed a
Subchapter 5 petition.

6.     The Debtor owns the real property at 232 Seigel Street, Brooklyn, New
York (the "Property") valued at $18,000,000 based on the February 26, 2020 purchase and sale

agreement with 232 Seigel Property, LLC (the "Purchaser"), a copy of which is annexed to the Plan as Exhibit A (the "Contract of Sale").  The Property is an assemblage of properties with approved plans to develop full-service hotel with 150 rooms with amenities, community space, parking and other features.

7.      Shortly after entering into the Contract of Sale, the mortgage market was frozen.

8.      Closing was scheduled for May 21, 2020.  The Purchaser projects that it won't be able to close until approximately November 2020.

9.      The Property is subject to a mortgage held by DB Seigel LLC ("Mortgagee") in the outstanding amount of approximately $5,250,000 ("Mortgage Loan").

10.     DB 232 Seigel Mezz LLC ("Mezz Lender"), an affiliate of the Mortgagee, holds a $3,000,000 claim against 232 Development secured by 232 Development's membership interests ("Membership Interests") in the Debtor (the "Mezz Loan").

11.     The Mortgage and Mezz Loan total about $8,250,000.  In addition, there is about $6,397,010 of combined unsecured debt against both Debtors, including the disputed $4,500,000 guarantee claim asserted by ER 215 Moore Holdings, LLC against both 232 Development and 232 Acquisition.  The grand total of disputed and undisputed debt is therefore $14,647,010.

12.     Since the Sale Contract could not close due to Covid, neither 232 Acquisition nor 232 Development could pay creditors as planned.

13.     The Mezz Lender had scheduled a sale of the Membership interests for April 7, 2020.  The Mezz Lender adjourned that sale to May 5, 2020, then to June 23, 2020, and finally to July 14, 2020.  But refused to adjourn the sale further.  That final adjournment notice was ambiguous and appeared to potentially contemplate the sale of both the Property and the Membership Interest.

14.     With the New York state courts closed for all practical purposes, Acquisition and Development had no choice but to file Chapter 11 petitions or risk losing the equity in the Property, and their ability to pay, among others, ER 215 Moore Holdings LLC.

15.     The bankruptcy strategy is not to obstruct payment to creditors, but to pay creditors in full in cash at closing the sale of the Property under the Plan.

16.     The net Sale Proceeds after payment of 232 Acquisition's creditor claims will be disbursed to 232 Development, as Acquisition's sole shareholder.  Under the Development Subchapter 5 plan, those net Sale Proceeds will be distributed to 232 Development's creditors, and then to its sole member, assuming there is a surplus.

17.     Since the grand total of debt is $14,647,010 whereas the purchase price is $18,000,000, all creditors will likely be paid if full, including ER 215 Moore Holdings LLC, even if the Contract of Sale does not close and the Property must be sold by auction a reduced price.

18.     ER 215 Holdings LLC, however, filed a motion to dismiss the bankruptcy cases.  This, notwithstanding the fact that the sale of the Property in those cases would be fastest

and surest way for payment. This dismissal motion, therefore, evidences an unspoken agenda which does not involve merely collecting the amounts it may legitimately be owed.

19. In summary, the Plan proposes to sell the Property under the Contract of Sale subject to higher and better offers, with the Sale Proceeds to be distributed to creditors in their order of priority. The net Sale Proceeds after payment of creditor claims will be disbursed to 232 Development, as the Debtor's sole shareholder. Under the 232 Development Subchapter V plan, those net Sale Proceeds will be distributed to 232 Development's creditors, and then to its sole member.

## DEBTOR'S PLAN OF REORGANIZATION

## CLASSIFICATION AND TREATMENT OF CLAIMS

### Class 1

20. **Classification** – Real estate tax Liens. Debtor estimates $0.00 due.

21. **Treatment** -- Payment on the Effective Date in full in Cash from the Property Sale Proceeds of Allowed Amount of each such Claim plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

22. **Voting** – Unimpaired and deemed to have accepted the Plan.

### Class 2

23. **Classification** – DB Seigel LLC first mortgage on the Property. The Debtor estimates that the amount due is $5,250,000.

24. **Treatment** – After payment of Class 1 Claims, payment on Effective Date of available Cash from the Property Sale Proceeds up to the Allowed Amount of the Class 2

Claim plus interest at the applicable contract rate as it accrues from the Petition Date through the date of payment.

25. **Voting** – Impaired and entitled to vote to accept or reject the Plan.

### Class 3

26. **Classification** –   Priority Claims under Sections 507(a)(2),(3),(4),(5),(6), and (7) of the Bankruptcy Code..  Debtor estimates $0 due.

27. **Treatment** – Payment on the Effective Date in full in Cash from the Property Sale Proceeds of Allowed Amount of each such Claim plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

28. **Voting --** Unimpaired and deemed to have accepted the Plan..

### Class 4

29. **Classification** – General Unsecured Claims $6,397,010, plus the Allowed Amount of any Class 5 deficiency Claim.

30. **Treatment** – After payment of Administrative Claims, unclassified Priority Tax Claims, Class 1, 2 and 3 Claims, Payment on the Effective Date of available Cash from the Property Sale Proceeds up to the Allowed Amount of each Class 4 Claim plus interest at the Legal Rate as it accrues from the Petition Date through the date of payment.

31. **Voting** – Impaired and entitled to vote to accept or reject the Plan..

### Class 5

32. **Classification** – Interests Holders.

33. **Treatment** – Payment on Effective Date of available Cash from the Property Sale Proceeds after payment of Administrative Claims, unclassified Priority tax Claims, and Class 1, 2, 3 and 4 Claims.

34. **Voting** – Impaired and entitled to vote to accept or reject the Plan.

## UNCLASSIFIED PRIORITY TAX CLAIMS

35. Priority tax Claims under Sections 507(a)(8) of the Bankruptcy Code. The Debtor estimates that the amount due by the Debtor totals approximately $0.00. The treatment of such Claims, if any, shall be payment in Cash on the Effective Date, of Allowed Amount of each such Claim plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

## ADMINISTRATIVE EXPENSES

36. Allowed Administrative Expenses shall be paid in full, in cash on the Effective Date, or the date such Administrative Expense becomes Allowed or as soon as practicable thereafter, except to the extent that the holder of an Allowed Administrative Expense agrees to a different treatment; provided, however, that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business or assumed by the Debtor shall be paid in full or performed by the Debtor in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.

37. Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Professional Fee Claims) must be filed and served no later than 35 days after entry of the Confirmation Order (the "Administrative Claims Bar Date"). Any

Person that is required to file and serve a request for payment of an Administrative Claim and fails to timely file and serve such request shall be forever barred, estopped, and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof. Objections to requests for payment of Administrative Claims (except for Professional Fee Claims and Administrative Claims incurred in the ordinary course of the Debtor's business) must be filed and served on counsel for the Debtor within thirty (30) days of the date such request for payment has been filed.

38.     Unless otherwise ordered by the Bankruptcy Court, and subject to notice and a hearing under section 330 of the Bankruptcy Code, requests for payment of Professional Fee Claims incurred through the Confirmation Date must be filed and served no later than sixty (60) days after the Effective Date (the "Professional Fee Claims Bar Date").

39.     The Debtor shall pay from Cash in the Estate all fees payable due as of the Effective Date pursuant to section 1930 of title 28 of the United Sates Code. Thereafter, the Debtor shall pay from Cash in the Estate all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus interest due under 31 U.S.C. § 3717, on all disbursements, including plan payments and disbursements in and outside of the ordinary course of business, until the earliest of the entry of a final decree closing the Chapter 11 Case, dismissal of the Chapter 11 Case, or conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

## MEANS FOR IMPLEMENTATION

40.     **Source of Funds** – Payments under the Plan will be made from the Sale Proceeds of the Debtor's Property and the liquidation of the Debtor's remaining Assets, The Property shall be sold under the Contract of Sale annexed as Exhibit "A" to the Plan, subject to

9

higher and better offers, as set forth in the Bidding Procedures attached to the Plan as Exhibit "B." Pursuant to § 1123(a)(5)(D) of the Bankruptcy Code, the Property shall be sold to the Purchaser, free and clear of any and all liens, claims, encumbrances, interests, bills, or charges whatsoever, other than the usual and customary utility easements, if any, appearing as of record or as preserved in the Plan, with any such Liens, Claims, and encumbrances to attach to the Property Sale Proceeds, and disbursed in accordance with the provisions of the Plan. The Mortgagee shall be obligated to assign of its mortgage to Purchaser's mortgagee, if any, in connection with the sale of the Property under the Plan.

41. **Sale Approval** – As part of the sale under the Plan, and in order to ensure consummation of the Plan, the Plan requires that the confirmation order contain the following findings of fact and conclusions of law: (a) that the terms and conditions of the sale are fair and reasonable, (b) that the Debtor's sale, and the Purchaser's purchase, of the Property pursuant to the Plan, is non-collusive, fair and reasonable and was conducted openly and in good faith, (c) that the transfer of the Property to the Purchaser represents an arm's-length transaction and was negotiated in good faith between the parties, (d) that the Purchaser, as transferee of the Property, is a good faith purchaser under Bankruptcy Code § 363(m) and, as such, is entitled to the full protection of Bankruptcy Code § 363(m), (e) the sale of the Property to the Purchaser was not controlled by an agreement among potential purchasers, (f) that no cause of action exists against the Purchaser or with respect to the sale of the Property to the Purchaser under Bankruptcy Code § 363(n), and (g) that any claims under Bankruptcy Code § 363(n) or any other claims as against the Purchaser are hereby released, waived and discharged.

42.     **Vesting** -- Except as otherwise provided in the Plan, on the Effective Date all Assets and properties of the Estate shall vest in the Debtor free and clear of all Liens, Claims and encumbrances and any and all liens, claims and encumbrances that have not been expressly preserved under the Plan shall be deemed extinguished as of such date.  Except as otherwise provided herein, as of the Effective Date, all Assets of the Debtor shall be free and clear of all Claims and Interests of Creditors, except for the obligations that are imposed under the Plan or by a Final Order of the Bankruptcy Court.

43.     **Execution of Documents** -- The Debtor shall be authorized to execute, in the name of any necessary party, any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved in the Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation.

44.     **Recording Documents** -- Each and every federal, state and local governmental agency or department shall be authorized to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan, including, but not limited to any and all notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved by the Plan, and the Confirmation Order.

45.     **Preservation of Claims** -- All rights pursuant to Sections 502, 544, 545 and 546 of the Bankruptcy Code, all Avoidance Actions shall be preserved for the benefit of the Reorganized Debtor's estate, provided, however, that the Debtor shall have sole authority for prosecuting any such claims.

46.    **Stamp Tax** -- Under the Plan, pursuant to Bankruptcy Code §1146(c), (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the Property by the Purchaser and any other transaction contemplated under the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject any applicable document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, or other similar tax or governmental assessment.

47.    **Release of Liens** – Except as otherwise provided for in the Plan, (a) each holder of a Secured Claim, shall on the Effective Date (x) turn over and release to the Debtor any and all collateral that secures or purportedly secures such Claim, as pertains to the Property or such Lien shall automatically, and without further action by the Debtor be deemed released, and (y) execute such documents and instruments as the Debtor requests to evidence such Claim holder's release of such property or Lien.

## MANAGEMENT OF THE DEBTOR

**48.** The Debtor is managed by GC Realty Advisors, by David Goldwasser. Post-confirmation management shall remain unchanged.

## LIQUIDATION ANALYSIS

**49.** In a liquidation under Chapter 7 of the Bankruptcy Code, the Debtor's assets would be sold and the Sale Proceeds distributed to Creditors in their order of priority. The Debtor believes that the Plan provides at least an equivalent return for the Debtor's estate as could be achieved in a liquidation. As set forth on Exhibit C hereto, the Debtor projects that in a Chapter 7 liquidation, the return to the Debtor's estate would be reduced by an additional layer of administration legal expenses and commissions, which the Debtor estimates would total at least 10% of the Sale Proceeds.

## LITIGATION ANALYSIS

**50.** The Debtor is aware of no litigation with third parties, except the claims of the Debtor, 232 Development and their co plaintiffs against ER 215 Moore LLC. The complaint in that action alleges that the defendant breached its fiduciary duty to the Debtor arising from a conflict interest between its role as both mortgage and member. The Debtor has discontinued the action.

## PAYMENT OF CLAIMS AND OBJECTIONS TO CLAIMS

**51.** The Debtor shall be disbursing agent under the Plan without a bond. On the initial distribution date and on each distribution date as may thereafter be necessary, the Debtor shall maintain an Disputed Claim Reserve for the holders of Disputed Claims as of such date in a sum not less than the amount required to pay each such Disputed Claim if such Claim

was Allowed in full.  To the extent that a Disputed Claim becomes an Allowed Claim, the distributions reserved for such Allowed Claim shall be released from the Disputed Claim Reserve and paid to the holder of such Allowed Claim.  After all the amounts of all Disputed Claims have been fixed, the balance of the Disputed Claim Reserve shall thereafter be paid in accordance with the Plan.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

52.     The Contract of Sale shall be assumed under the Plan, subject to higher and better offers as set forth in the Means for Implementation section herein.  Except for other executory contracts and unexpired leases the Debtor assumes before the Confirmation Date, all unexpired leases and executory contracts shall be deemed rejected under the Plan.  In the event of a rejection which results in damages a proof of claim for such damages must be filed by the damaged party with the Court within sixty (60) days after the rejection date. All Allowed Claims arising from the rejection of any Executory Contract or unexpired lease shall be treated as Unsecured Claims.  Any Claim arising from the rejection of any Executory Contract or unexpired lease not filed with the Court within the time period provided herein shall be deemed discharged and shall not be entitled to participate in any distribution under the Plan.

## TAX CONSEQUENCES

53.     The Debtor does not believe that there will be any negative tax consequences to the Debtor or to Creditors under the Plan.  To the extent that a creditor is not paid in full under the Plan, such creditor may be entitled to a bad debt deduction.  To the extent that a creditor has taken a bad debt deduction, Plan distributions may be taxable as income.

54.     THE DEBTOR DOES NOT PURPORT, THROUGH THIS DISCLOSURE STATEMENT, TO ADVISE CREDITORS OR INTEREST HOLDERS REGARDING THE TAX CONSEQUENCES OF THE TREATMENT OF THE CREDITORS AND INTEREST HOLDERS UNDER THE PLAN.  CREDITORS AND INTEREST HOLDERS SHOULD SEEK INDEPENDENT COUNSEL CONCERNING THE TAX CONSEQUENCES OF THEIR TREATMENT UNDER THE PLAN.

## PLAN ALTERNATIVES

55.     Generally, plan options in these circumstances include selling, refinancing, recapitalizing or loan modification.  Given the state of the credit markets, the sale of the Property will yield a greater return, particularly in the short and medium term, than refinancing or recapitalizing.  For the same reasons, there are no viable loan modification options. In this case, therefore, the Debtor believes that selling the Property is the only viable alternative.

## VOTING PROCEDURES AND REQUIREMENTS

56.     A ballot to be used for voting to accept or reject the Plan is enclosed with this Disclosure Statement.  Each impaired creditor is entitled to execute the ballot and return it to the undersigned to be considered for voting purposes.  The Bankruptcy Court has directed that, in order to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received no later than _____, 2020, at the following address: Backenroth Frankel & Krinsky, LLP, 800 Third Avenue, Floor 11, New York, New York 10022, Attn:  Mark A. Frankel, Esq.

57.     Each Creditor of the Debtor whose Claim is impaired under the Plan is entitled to vote, if either (i) its Claim has been scheduled by the Debtor, or (ii) it has filed a Proof of Claim on or before the last date set by the Bankruptcy Court.

58.     Any Claim as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the Claim in an amount which it deems proper for the purpose of accepting or rejecting the Plan upon motion by a Creditor whose Claim is subject to an objection.  Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Court to confirm the Plan.

59.     A Creditor's vote may be disregarded if the Bankruptcy Court determines that the Creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

60.     The Bankruptcy Code defines acceptance of a Plan by a class of Creditors as acceptance by holders of two-thirds in dollar amount and a majority in number of the Claims of that class which actually cast ballots for acceptance or rejection of the Plan.

61.     The Bankruptcy Code defines acceptance of a Plan by a class of Interests as acceptance by holders of two-thirds in amount of the allowed Interests of such class held by holders of such interests.

## CRAMDOWN

90.     If any impaired class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan if, as to each impaired class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."

91.     The Debtor intends to invoke the cramdown provisions of section 1129(b) as to any impaired class that does not accept the plan.

92.     A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives less than it is legally entitled to receive for its Claims or Interests.  "Fair and equitable" has different meanings for Secured and Unsecured Claims.

93.     With respect to a Secured Claim, "fair and equitable" means either: (a)  the impaired Secured Creditor retains its Liens to the extent of its Allowed Claim and receives deferred cash payments at least equal to the allowed amount of its Claim with a present value as of the Effective Date at least equal to the value of such Creditor's interest in the property securing its Liens; (b) property subject to the Lien of the impaired Secured Creditor is sold free and clear of that Lien, with that Lien attaching to the proceeds of the sale; or  (c) the impaired Secured Creditor realizes the "indubitable equivalent" of its Claim under the Plan.

94.     With respect to an Unsecured Claim, "fair and equitable" means either: (a) each impaired Unsecured Creditor receives or retains property of a value equal to the amount of its Allowed Claim; or (b) the holders of Claims and Interests that are junior to the Claims of the dissenting class will not receive any property under the Plan.

95.     In the event one or more classes of impaired Claims rejects the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of Claims.

## <u>CONFIRMATION OF THE PLAN</u>

62.     Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). Section 1128(b) provides that any party in interest may object to confirmation of the Plan.

63.     By order of the Bankruptcy Court dated _____, 2020, the Confirmation Hearing has been scheduled for _____, 2020, at ___.m., in the Honorable Robert D. Drain's Courtroom, United States Bankruptcy Court, 300 Quarropas Street, White Plains, NY 10601−5008.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjourned Confirmation Hearing.  Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court with proof of service and served upon the following on or before _____ 2020 at 5:00 p.m.:  Backenroth Frankel & Krinsky, LLP, 800 Third Avenue, New York, New York  10022, Attn:  Mark A. Frankel, Esq.  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

64.     At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied to enter an order confirming the Plan.  The applicable requirements are as follows:  (a)  The Plan complies with the applicable provisions of the Bankruptcy Code, (b) the Debtor has complied with the

applicable provisions of the Bankruptcy Code; (c) the Plan has been proposed in good faith and not by any means forbidden by law, (d) any payment made or promised or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with, the Bankruptcy Case, or in connection with the Plan and incident to the Bankruptcy Case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable, (e) the Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a Plan with the Debtor, or a successor to the Debtor under the Plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of Creditors and equity security holders and with public policy, and the Debtor has disclosed the identity of any insider that will be employed or retained by the reorganized Debtor, and the nature of any compensation for such insider, (f) with respect to each class of impaired Claims, either each holder of a Claim or interest of such class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or interest property of a value, as of the Effective Date of the Plan, an amount that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated on such date under Chapter 7 of the Bankruptcy Code, (g) each class of Claims or interests has either accepted the Plan or is not impaired under the Plan, (h) except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expenses and priority Claims will be paid in full on the Effective Date, (i) at least one class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider

holding a Claim of such class, and (j) confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor or any successors to the Debtor under the Plan unless such liquidation or reorganization is proposed in the Plan.

65.     The Debtor believes that the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of Chapter 11, and that the proposals contained in the Plan are made in good faith.

## CONCLUSION

The Debtor urges the Debtor's Creditors to support the Plan.

Dated: New York, New York
         August 27, 2020

232 Seigel Acquisition LLC


By:     s/ GC Realty Advisors, by David Goldwasser


**BACKENROTH FRANKEL & KRINSKY, LLP**
**Attorneys for Debtor**


By:     s/Mark Frankel
        800 Third Avenue
        New York, New York 10022
        (212) 593-110

## Exhibit A to Disclosure Statement

Mark Frankel
Backenroth Frankel & Krinsky, LLP
800 Third Avenue, Floor 11
New York, New York  10022
(212) 593-1100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

In re                                                                   Chapter 11

       232 Seigel Acquisition LLC                          Case no.  20-22845

                 Debtor.
----------------------------------------------------------------x


## PLAN OF REORGANIZATION

## INTRODUCTION

232 Seigel Acquisition LLC (the "Debtor") submit this plan of reorganization ("Plan") under Chapter 11 of the United States Bankruptcy Code. UPON CONFIRMATION, THIS PLAN SHALL BE A BINDING OBLIGATION BETWEEN AND AMONG THE DEBTOR AND THE DEBTOR'S CREDITORS (AS SUCH TERMS ARE DEFINED BELOW).

## DEFINITIONS

As used in this Plan, the following terms will have the meanings hereinafter set forth:

1.      "Administrative Expense" shall mean any cost or expense of administration of the Bankruptcy Case entitled to priority under section 507(a)(1) and allowed under section 503(b) of the Bankruptcy Code, and any fees or charges assessed against the Debtor's Estate under Chapter 123, Title 28, United States Code.

2.      "Administrative Expense Claim" shall mean a Claim for payment of an Administrative Expense.

3.      "Agreement" shall mean that certain agreement annexed to the Plan as Exhibit A, by and between the Debtor and the Purchaser for the sale of the Property.

4.      "Allowance Date" shall mean the date which a Disputed Claim becomes an Allowed Claim by Final Order.

5.      "Allowed Amount" shall mean the amount of an "Allowed Claim."

6.      "Allowed Claim" shall mean a Claim: (a) to the extent that a Proof of Claim is filed timely or, with leave of the Court late filed as to which (i) no party in interest files an objection or (ii) which is allowed by a Final Order; or (b) which is listed on the Debtor's

2

schedules or any amendments thereto but which is not listed therein as disputed, unliquidated or contingent.

7. "Allowed Secured Claim" shall mean a Secured Claim to the extent it is an Allowed Claim.

8. "Allowed Unsecured Claim" shall mean an Unsecured Claim to the extent it is an Allowed Claim.

9. "Assets" shall mean any and all of the respective real or personal property of any nature of the Debtor, including, without limitation, any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, work in process, accounts, chattel paper, Cash, deposit accounts, reserves, deposits, contractual rights, intellectual property rights, claims, Causes of Action and any other general intangibles of the Debtor, of any nature whatsoever, including, without limitation, the property of the estate pursuant to section 541 of the Bankruptcy Code.

10. "Avoidance Actions" shall mean all claims and causes of action which the Debtor has or had the power to assert pursuant to any or all of sections 510, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code.

11. "Bankruptcy Case" shall mean this Chapter 11 bankruptcy case.

12. "Bankruptcy Code" shall mean Title 11 of the United States Code (11. U.S.C. § 101 et. seq.).

13. "Bankruptcy Court" shall mean the Court as defined below.

14. "Bar Date" shall mean _____.

15. "Cash" shall mean all cash and cash equivalents which evidence immediately available funds in United States dollars.

16. "Causes of Action" shall mean any and all claims and causes of action of, and remedies granted to, the Debtor against any third party, including, without limitation, any Avoidance Actions or causes of action pursuant to sections 502, 506, 510, 541 through 545, 547 through 551, and/or 553 of the Bankruptcy Code and any claims pursuant to any other statutory or common law.

17. "Claim" shall mean a right to payment as set forth in § 101(5) of the Bankruptcy Code.

18. "Claimant" shall mean the holder of a Claim.

19. "Confirmation Date" shall mean the date of the entry of the Confirmation Order.

20. "Confirmation Hearing" shall mean the hearing pursuant to the Bankruptcy Code Section 1128 before the Bankruptcy Court regarding the proposed confirmation of the Plan.

21. "Confirmation Order" shall mean the order of the Court confirming the Plan.

22. "Court" shall mean the United States Bankruptcy Court for the SOUTHERN District of New York.

23. "Creditor" shall mean any entity that holds a Claim against the Debtor.

24. "Creditors Committee" shall mean a committee of creditors appointed by the United States Trustee in these cases under section 1102 of the Bankruptcy Code.

25. "Debtor" shall mean 232 Seigel Acquisition LLC.

26. "Disputed Claim" shall mean the whole or any portion of any Claim against the Debtor to which an objection is timely filed or may be timely filed as to which a Final Order has not been entered allowing or disallowing such Claim or any portion thereof.

27. "Disputed Claim Reserve" shall mean Cash to be set aside by the Disbursing Agent on the Effective Date in an escrow account maintained by the Disbursing Agent, in an amount equal to the amount that would have been distributed to the holders of Disputed Claims had such Claims been deemed Allowed Claims on the Effective Date, or in such other amount as may be approved by the Bankruptcy Court.

28. "Effective Date" shall mean the Date upon which the Confirmation Order is a Final Order, or such other date no later than 60 days after the Confirmation Date as may be practicable.

29. "Estate" shall mean the estate of the Debtor created upon the commencement of the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code.

30. "Executory Contracts" shall mean "executory contracts" and "unexpired leases" as such terms are used within Section 365 of the Bankruptcy Code.

31. "Final Order" shall mean an order of a court that has not been reversed, modified, amended or stayed, and as to which the time to appeal or to seek review or certiorari thereof has expired, and as to which no appeal, review or rehearing is pending.

32.     "Mortgagee" shall mean DB Seigel LLC.

33.     "Impaired" shall mean not Unimpaired.

34.     "Interest" shall mean an existing ownership interest in the Debtor.

35.     "Interest Holder" shall mean a holder and owner of an existing Interest in the Debtor.

36.     "Legal Rate" shall mean the applicable interest rate as set forth in 28 U.S.C. §1961 as of the Petition Date.

37.     "Lien" shall mean a charge against or interest in property to secure payment of a debt or performance of an obligation.

38.     "Petition Date" shall mean July 14, 2020.

39.     "Plan" shall mean this Plan of Reorganization, and any and all modifications and/or amendments hereto.

40.     "Professional(s)" shall mean any entity or person employed pursuant to an order of the Bankruptcy Court in accordance with sections 327, 328, or 1103 of the Bankruptcy Code and to be compensated for services rendered pursuant to sections 327, 328, 329, 330 and/or 331 of the Bankruptcy Code.

41.     "Professional Fee Claim" shall mean those fees and expenses claimed by a Professional pursuant to sections 330, 331 and/or 503 of the Bankruptcy Code.

42.     "Professional Fee Claim Bar Date" shall mean the last day for a Professional to file a Professional Fee Claim, which shall be no later than thirty (60) days after the Effective Date.

43. "Property" shall mean 232 Seigel Street, Brooklyn, New York.

44. "Sale Proceeds" shall mean the proceeds of sale of the Property, less all charges to be incurred in connection with the marketing, negotiation, documentation, execution, and closing of the sale of the Property, including, without limitation, any fees and expenses paid to retain an auctioneer, real estate broker, and/or special real estate counsel.

45. "Purchaser" shall mean the purchaser of the Property pursuant to the Plan.

46. "Reorganized Debtor" shall mean the Debtor on and after the Effective Date.

47. "Secured Claim" shall mean a Claim secured by a Lien on property included within the Debtor's Estate.

48. "Secured Creditor" shall mean the owner or holder of a Secured Claim.

49. "Unimpaired" shall mean not impaired under section 1124 of the Bankruptcy Code.

50. "Unsecured Claim" shall mean a claim for which the Claimant does not hold (a) a valid, perfected and enforceable Lien, security interest or other interest in or encumbrance against Debtor or the Debtor's Estate; or (b) a right to setoff to secure the payment of such Claim. An Unsecured Claim includes, but is not limited to, a Claim for damages resulting from rejection of any Executory Contract pursuant to Section 365 of the Bankruptcy Code and does not include administrative of priority claims.

51. "Unsecured Creditor" shall mean the owner or holder of an Unsecured Claim.

## CLAIMS CLASSIFICATION, TREATMENT AND VOTING

### Class 1

1.      **Classification** – Real estate tax Liens. Debtor estimates $0.00 due.

2.      **Treatment** -- Payment on the Effective Date in full in Cash from the Property Sale Proceeds of Allowed Amount of each such Claim plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

3.      **Voting** – Unimpaired and deemed to have accepted the Plan.

### Class 2

4.      **Classification** – DB Seigel LLC first mortgage on the Property.  The Debtor estimates that the amount due is $5,250,000.

5.      **Treatment** – After payment of Class 1 Claims, payment on Effective Date of available Cash from the Property Sale Proceeds up to the Allowed Amount of the Class 2 Claim plus interest at the applicable contract rate as it accrues from the Petition Date through the date of payment.

6.      **Voting** – Impaired and entitled to vote to accept or reject the Plan.

### Class 3

7.      **Classification** –   Priority Claims under Sections 507(a)(2),(3),(4),(5),(6), and (7) of the Bankruptcy Code..  Debtor estimates $0 due.

8.      **Treatment** – Payment on the Effective Date in full in Cash from the Property Sale Proceeds of Allowed Amount of each such Claim plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

9.      __Voting --__ Unimpaired and deemed to have accepted the Plan..

### Class 4

10.      __Classification__ – General Unsecured Claims $6,397,010, plus the Allowed Amount of any Class 5 deficiency Claim.

11.      __Treatment__ – After payment of Administrative Claims, unclassified Priority Tax Claims, Class 1, 2 and 3 Claims, Payment on the Effective Date of available Cash from the Property Sale Proceeds up to the Allowed Amount of each Class 4 Claim plus interest at the Legal Rate as it accrues from the Petition Date through the date of payment.

12.      __Voting__ – Impaired and entitled to vote to accept or reject the Plan..

### Class 5

13.      __Classification__ – Interests Holders.

14.      __Treatment__ – Payment on Effective Date of available Cash from the Property Sale Proceeds after payment of Administrative Claims, unclassified Priority tax Claims, and Class 1, 2, 3 and 4 Claims.

15.      __Voting –__ Impaired and entitled to vote to accept or reject the Plan.

### UNCLASSIFIED PRIORITY TAX CLAIMS

16.      Priority tax Claims under Sections 507(a)(8) of the Bankruptcy Code.  The Debtor estimates that the amount due by the Debtor totals approximately $0.00.  The treatment of such Claims, if any, shall be payment in Cash on the Effective Date, of Allowed Amount of each such Claim plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

## ADMINISTRATIVE EXPENSES

17.     Allowed Administrative Expenses shall be paid in full, in cash on the Effective Date, or the date such Administrative Expense becomes Allowed or as soon as practicable thereafter, except to the extent that the holder of an Allowed Administrative Expense agrees to a different treatment; provided, however, that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business or assumed by the Debtor shall be paid in full or performed by the Debtor in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.

18.     Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Professional Fee Claims) must be filed and served no later than 35 days after entry of the Confirmation Order (the "Administrative Claims Bar Date"). Any Person that is required to file and serve a request for payment of an Administrative Claim and fails to timely file and serve such request shall be forever barred, estopped, and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof. Objections to requests for payment of Administrative Claims (except for Professional Fee Claims and Administrative Claims incurred in the ordinary course of the Debtor's business) must be filed and served on counsel for the Debtor within thirty (30) days of the date such request for payment has been filed.

19.     Unless otherwise ordered by the Bankruptcy Court, and subject to notice and a hearing under section 330 of the Bankruptcy Code, requests for payment of Professional Fee Claims incurred through the Confirmation Date must be filed and served no later than sixty (60) days after the Effective Date (the "Professional Fee Claims Bar Date").

20.     The Debtor shall pay from Cash in the Estate all fees payable due as of the Effective Date pursuant to section 1930 of title 28 of the United Sates Code. Thereafter, the Debtor shall pay from Cash in the Estate all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus interest due under 31 U.S.C. § 3717, on all disbursements, including plan payments and disbursements in and outside of the ordinary course of business, until the earliest of the entry of a final decree closing the Chapter 11 Case, dismissal of the Chapter 11 Case, or conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

## MEANS FOR IMPLEMENTATION

21.     **Source of Funds** – Payments under the Plan will be made from the proceeds of sale of the Debtor's Property the liquidation of the Debtor's remaining Assets, The Property shall be sold under the Contract of Sale annexed as Exhibit "A" to the Plan, subject to higher and better offers, as set forth in the Bidding Procedures attached to the Plan as Exhibit "B."  Pursuant to § 1123(a)(5)(D) of the Bankruptcy Code, the Property shall be sold to the Purchaser, free and clear of any and all liens, claims, encumbrances, interests, bills, or charges whatsoever, other than the usual and customary utility easements, if any, appearing as of record or as preserved in the Plan, with any such Liens, Claims, and encumbrances to attach to the Property Sale Proceeds, and disbursed in accordance with the provisions of the Plan.  The Mortgagee shall be obligated to assign of its mortgage to Purchaser's mortgagee, if any, in connection with the sale of the Property under the Plan.

22.     **Sale Approval** – As part of the sale under the Plan, and in order to ensure consummation of the Plan, the Plan requires that  the confirmation order contain the following findings of fact and conclusions of law: (a) that the terms and conditions of the sale are fair and

reasonable, (b) that the Debtor's sale, and the Purchaser's purchase, of the Property pursuant to the Plan, is non-collusive, fair and reasonable and was conducted openly and in good faith, (c) that the transfer of the Property to the Purchaser represents an arm's-length transaction and was negotiated in good faith between the parties, (d) that the Purchaser, as transferee of the Property, is a good faith purchaser under Bankruptcy Code § 363(m) and, as such, is entitled to the full protection of Bankruptcy Code § 363(m), (e) the sale of the Property to the Purchaser was not controlled by an agreement among potential purchasers, (f) that no cause of action exists against the Purchaser or with respect to the sale of the Property to the Purchaser under Bankruptcy Code § 363(n), and (g) that any claims under Bankruptcy Code § 363(n) or any other claims as against the Purchaser are hereby released, waived and discharged.

23. **Vesting** -- Except as otherwise provided in the Plan, on the Effective Date all Assets and properties of the Estate shall vest in the Debtor free and clear of all Liens, Claims and encumbrances and any and all liens, claims and encumbrances that have not been expressly preserved under the Plan shall be deemed extinguished as of such date.  Except as otherwise provided herein, as of the Effective Date, all Assets of the Debtor shall be free and clear of all Claims and Interests of Creditors, except for the obligations that are imposed under the Plan or by a Final Order of the Bankruptcy Court.

24. **Execution of Documents** -- The Debtor shall be authorized to execute, in the name of any necessary party, any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved in the Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation.

25.    **Recording Documents** -- Each and every federal, state and local governmental agency or department shall be authorized to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan, including, but not limited to any and all notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved by the Plan, and the Confirmation Order.

26.    **Preservation of Claims** -- All rights pursuant to Sections 502, 544, 545 and 546 of the Bankruptcy Code, all Avoidance Actions shall be preserved for the benefit of the Reorganized Debtor's estate, provided, however, that the Debtor shall have sole authority for prosecuting any such claims.

27.    **Stamp Tax** -- Under the Plan, pursuant to Bankruptcy Code §1146(c), (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the Property by the Purchaser and any other transaction contemplated under the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject any applicable document recording tax, stamp tax,

conveyance fee or other similar tax, mortgage tax, real estate transfer tax, or other similar tax or governmental assessment.

28. **<u>Release of Liens</u>** – Except as otherwise provided for in the Plan, (a) each holder of a Secured Claim, shall on the Effective Date (x) turn over and release to the Debtor any and all collateral that secures or purportedly secures such Claim, as pertains to the Property or such Lien shall automatically, and without further action by the Debtor be deemed released, and (y) execute such documents and instruments as the Debtor requests to evidence such Claim holder's release of such property or Lien.

## <u>MANAGEMENT OF THE DEBTOR</u>

29. The Debtor is managed by GC Realty Advisors, by David Goldwasser. Post-confirmation management shall remain unchanged.

## <u>DISTRIBUTIONS TO CREDITORS</u>

30. The Debtor shall be disbursing agent under the Plan without a bond. On the initial distribution date and on each distribution date as may thereafter be necessary, the Debtor shall maintain an Disputed Claim Reserve for the holders of Disputed Claims as of such date in a sum not less than the amount required to pay each such Disputed Claim if such Claim was Allowed in full. To the extent that a Disputed Claim becomes an Allowed Claim, the distributions reserved for such Allowed Claim shall be released from the Disputed Claim Reserve and paid to the holder of such Allowed Claim. After all the amounts of all Disputed Claims have been fixed, the balance of the Disputed Claim Reserve shall thereafter be paid in accordance with the Plan.

## EXECUTORY CONTRACTS

31.     The Contract of Sale shall be assumed under the Plan, subject to higher and better offers as set forth in the Means for Implementation section herein.  Except for other executory contracts and unexpired leases the Debtor assumes before the Confirmation Date, all unexpired leases and executory contracts shall be deemed rejected under the Plan.  In the event of a rejection which results in damages a proof of claim for such damages must be filed by the damaged party with the Court within sixty (60) days after the rejection date. All Allowed Claims arising from the rejection of any Executory Contract or unexpired lease shall be treated as Unsecured Claims.  Any Claim arising from the rejection of any Executory Contract or unexpired lease not filed with the Court within the time period provided herein shall be deemed discharged and shall not be entitled to participate in any distribution under the Plan.

## RETENTION OF JURISDICTION

32.     Retention of Jurisdiction.  The Court shall have jurisdiction over all matters arising under, arising in, or relating to the Debtor's Bankruptcy Case including, but not limited to, proceedings:

- To consider any modification of the Plan under Section 1127 of the Bankruptcy Code;

- To hear and determine all Claims, controversies, suits and disputes against the Debtor to the full extent permitted under 28 U.S.C. §§ 1334 and 157;

- To hear, determine and enforce all Claims and Causes of Action which may exist on behalf of the Debtor or the Debtor's Estate, including, but not limited to, any right of the Debtor or the Debtor's Estate to recover assets pursuant to the provisions of the Bankruptcy Code;

- To hear and determine all requests for compensation and/or reimbursement of expenses which may be made;

- To value assets of the Estate.

- To enforce the Confirmation Order, the final decree, and all injunctions therein;

- To enter an order concluding and terminating the Bankruptcy Case;

- To correct any defect, cure any omission, or reconcile any inconsistency in the Plan, or the Confirmation Order;

- To determine all questions and disputes regarding title to the assets of the Debtor.

- To re-examine Claims which may have been Allowed or disallowed for purposes of voting, and to determine objections which may be filed to any Claims.

## GENERAL PROVISIONS

33. **Headings**. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the meaning of the Plan.

34. **Calculation of Time Periods**. Bankruptcy Rule 9006 is incorporated herein for purposes of calculating the dates set forth herein.

35. **Other Actions**. Nothing contained herein shall prevent the Debtor, Interest Holders, or Creditors from taking such actions as may be necessary to consummate the Plan, although such actions may not specifically be provided for within the Plan.

36. **Modification of Plan**. The Debtor may seek amendments or modifications to the Plan in accordance with Section 1127 of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date, the Debtor may seek to remedy

any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan

## INJUNCTION AND DISCHARGE

37. **Injunction**. The confirmation of this Plan shall constitute an injunction of the Court against the commencement or continuation of any action, the employment of process, or any act, to collect, recover or offset from the Debtor or its property or properties, any obligation or debt except pursuant to the terms of the Plan.

38. **Discharge.** On the Effective Date, except as otherwise expressly provided in this Plan or the Confirmation Order, the Plan shall: (i) discharge the Debtor and any of its Assets from all Claims, demands, liabilities and other debts that arose on or before the Effective Date, including, without limitation, all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (A) a proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (B) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code, (C) a Claim based on such debt is or has been disallowed by order of the Bankruptcy Court, or (D) the holder of a Claim based on such debt has accepted this Plan; and (ii) preclude all entities from asserting against the Debtor or any of its Assets any other or further Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, all pursuant to sections 524 and 1141 of the Bankruptcy Code. The discharge provided in this provision shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim. The Debtor shall be discharged from any Claims and agreements related to debts that

arose on or before the Effective Date and such debts, Claims and agreements are deemed

restructured and new as set forth in the Plan.

## CLOSING THE CASE

39.     Upon substantial consummation, the Debtor may move for a final decree
to close the Bankruptcy Case and to request such other orders as may be just.

Dated: New York, New York
       August 27, 2019

                            232 Seigel Acquisition LLC


                    By:     s/ GC Realty Advisors, by David Goldwasser


                            BACKENROTH FRANKEL & KRINSKY, LLP
                            Attorneys for Debtor


                    By:     s/Mark A. Frankel
                            800 Third Avenue
                            New York, New York 10022
                            (212) 593-1100

<u>**EXHIBIT A TO PLAN**</u>

<u>**BIDDING AND AUCTION PROCEDURES**</u>

These Terms and Conditions of Sale are promulgated in connection with the auction sale (the "Sale") of the real property located at 232 Seigel Street, Brooklyn, New York (the "Property").

<u>Time and Place of Sale</u>:  The Sale will be held on _____, 2020 at ____ __ m. at the offices of Backenroth Frankel & Krinsky, LLP, 800 Third Avenue New York, New York 10022.

<u>Sale Pursuant to Chapter 11 Plan</u>:  The Seller of the Property is 232 Seigel Acquisition LLC (the "Debtor").  The sale shall be conducted pursuant to Bankruptcy Code section 363 and the Chapter 11 Plan of Reorganization (the "Plan") proposed by the Debtor as the Plan proponent ("Proponent").

<u>Sale free and Clear of Liens</u>:  The Sale of the Property shall be conducted pursuant to the Proponent's Plan of Reorganization free and clear of liens, claims, and encumbrances, with any such liens, claims and encumbrances to attach to the sale proceeds, and disbursed under the Plan.

<u>Qualification to Bid</u>:   In order to be qualified to bid on the Property, within seven days prior to the commencement of the Sale, each prospective bidder must deliver to the Proponent (a) a bank check in the amount of 10% of its opening bid (the "Qualifying Deposit") payable to "Backenroth Frankel & Krinsky, LLC, as Attorneys" (b) evidence reasonably demonstrating such bidder's ability to consummate a sale on the terms proposed, and (c) a written offer to purchase substantially in the form annexed hereto.  No later than one business day before the Sale, each bidder will be notified by the Proponent as to whether the Proponent deems such bidder qualified to bid at the Sale.

<u>Bidding</u>: Bidding shall be conducted openly at the Sale.  The opening bid shall be $18,000,000 ($18,000,000).  Minimum bidding increments shall be $50,000 ($50,000).

<u>Successful Bidder Additional Deposit</u>: At the Sale, once a bidder is determined to have made the highest or best bid for the Property at the Sale (the "Successful Bidder"), bidding shall be deemed closed and no additional bids will be considered.  Within one business day after the Successful Bidder is determined, the Successful Bidder shall be required to increase the Qualifying Deposit to an amount equal to ten percent of the winning bid, which amount shall serve as a good faith deposit against payment of the Purchase Price.  At the conclusion of the Sale, the Proponent's counsel will return the Qualifying Deposits to all other bidders.

<u>Sale Approval Hearing</u>:  A hearing will be conducted by the Bankruptcy Court on approval of the sale on the ___ day of _____, 2020 at _____, at the United States Bankruptcy Court, 300 Quarropas Street, White Plains, NY 10601−5008.

<u>Sale Approval Order</u>:  the sale approval order shall approve the Sale, and in connection therewith, shall contain the following findings of fact and conclusions of law: (a) that the Terms and Conditions of the Sale are fair and reasonable, (b) that the Sale and the Purchaser's purchase, of the Property pursuant to the Plan, is non-collusive, fair and reasonable and was conducted openly and in good faith, (c) that the transfer of the Property to the Purchaser represents an arm's-length transaction and was negotiated in good faith between the parties, (d) that the Purchaser, as transferee of the Property, is a good faith Purchaser under Bankruptcy Code § 363(m) and, as such, is entitled to the full protection of Bankruptcy Code § 363(m), (e) the sale of the Property to the Purchaser was not controlled by an agreement among potential purchasers, (f) that no cause of action exists against the Purchaser or with respect to the sale of the Property to the Purchaser under Bankruptcy Code § 363(n), and (g) that any claims under Bankruptcy Code § 363(n) or any other claims as against the Purchaser are hereby released, waived and discharged.

<u>Closing</u>:  The Successful Bidder must pay the balance of the Purchase Price for the Property (the difference between the amount of the successful bid and the Qualifying Deposit) to the Proponent, by bank check, or wire transfer at the closing of title to the Property (the "Closing"). The Successful Bidder must close title to the Property at a date that is no more than thirty (30) days after the Order by the Bankruptcy Court is entered, TIME BEING OF THE ESSENCE as to the Successful Bidder, although such date may be extended solely by the Proponent.

<u>Transfer Tax</u>:  Under the Plan, pursuant to section 1146(c) Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the Property by the Purchaser and any other transaction contemplated under the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject any applicable document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, or other similar tax or governmental assessment including without limitation New York State Documentary Tax.

<u>Damages for Failure to Close</u>:  Time is of the Essence as Against the Successful Bidder and the failure of the Successful Bidder to either timely pay the additional Qualifying Deposit or timely close for any reason whatsoever (except as otherwise provided below) including its failure to pay the balance of the Purchase Price on the Closing Date, will result in the Proponent retaining the deposit as liquidated damages and the termination of the Successful Bidder's right to acquire the Property.  The Successful Bidder shall be obligated to close title to the Property and there is no contingency of any kind or nature that will permit the Successful Bidder to cancel or avoid its obligation other than the Proponent's inability to deliver bargain and sale deeds to the Property.

Expenses incurred by the Successful Bidder, or any competing bidder relating to any due diligence, such as obtaining title reports or environmental inspections, shall be the sole responsibility of such bidder, and under no circumstances shall the Proponent or the Proponent's professionals be responsible for, or pay, such expenses.

Backup Bidder:  In the event that the Successful Bidder for the Property fails to tender the payment of the balance of the Purchase Price on the Closing Date, or otherwise perform any of its obligations under these Terms and Conditions of Sale, the Proponent, at its sole option, shall be authorized to sell the Property to the Second Highest Bidder without any further notice without giving credit for the Deposit forfeited by the Successful Bidder, and upon such other terms and conditions as the Proponent deems appropriate.  Should the Second Highest Bidder fail to close on the Property, within such time as the parties may agree but not to exceed thirty (30) days after notice from the Proponent to the Second Highest Bidder, the Proponent shall be authorized to sell the Property to the next highest or best bidder, without the necessity of any further notice.  All bidders will be bound by these Terms and Conditions of Sale, including, without limitation, those items set forth in the paragraphs above, except that the Second Highest Bidder must close within thirty (30) days of notification that his bid is accepted.  TIME IS OF THE ESSENCE.

No Representations:  the Debtor and the Debtor's professionals have not made and do not make any representations as to the physical condition, rents, leases, expenses, operations, value of the land or buildings thereon, or any other matter or thing affecting or related to the Property or the Sale, which might be pertinent to the purchase of the Property, including, without limitation, (i) the current or future real estate tax liability, assessment or valuation of the Property; (ii) the potential qualification of the Property for any and all benefits conferred by or available under federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated; (iii) the compliance or non-compliance of the Property, in its current or any future state, with applicable present or future zoning ordinances or other land use law or regulation, or the ability to obtain a change in the zoning or use, or a variance in respect to the Property; (iv) the availability of any financing for the purchase, alteration, rehabilitation or operation of the Property from any source, including, but not limited to, any state, city or federal government or institutional lender; (v) the current or future use of the Property; (vi) the present and future condition and operating state of any and all machinery or equipment on the Property and the present or future structural and physical condition of any building thereon or its suitability for rehabilitation or renovation; (vii) the ownership or state of title of any personal property on the Property; (viii) the presence or absence of any laws, ordinances, rules, rent regulations, or other regulations of any governmental authority, agency or board and any violations thereof; (ix) any present or future issues concerning subdivision or non-subdivision of the Property; or (x) the compliance or non-compliance with environmental laws and the presence or absence of underground fuel storage tanks, any asbestos or other hazardous materials anywhere on the Property.  Each bidder shall be deemed to have agreed and acknowledged that no such representations have been made.  The Proponent is not liable or bound in any manner by expressed or implied warranties, guaranties, promises, statements, representations or information pertaining to the Property, made or furnished by the Proponent or any real estate broker agent,

employee, servant or other person or professional representing or purporting to represent the Proponent unless such warranties, guaranties, promises, statements, representations or information are expressly and specifically set forth in writing by the Proponent. For the avoidance of doubt, neither the Debtor nor the Debtor's professionals are authorized to provide any such warranties, guaranties, promises, statements, representations or information.

As Is Sale: The Property is being sold free and clear of all liens, claims, and encumbrances, with any such liens, claims and encumbrances to attach to the net proceeds of sale after deduction of any expenses of sale. Furthermore, the Property is being sold "AS IS", "WHERE IS" "WITH ALL FAULTS", without any representations, covenants, guarantees or warranties of any kind or nature whatsoever and subject to, among other things, (a) any state of facts that an accurate survey may show; (b) any covenants, restrictions and easements of record; (c) any state of facts a physical inspection may show; (d) any building or zoning ordinances or other applicable municipal regulations and violations thereof; and (e) environmental conditions, including, without limitation, the Property's compliance (or lack of compliance) with environmental laws and the presence or absence of underground fuel storage tanks, any hazardous materials or asbestos anywhere on the Property. By delivering their respective Qualifying Deposits, each bidder is deemed to have acknowledged that it has had the opportunity to review and inspect the Property, the state of title thereof and laws, rules and regulations applicable thereto, and will rely solely thereon and on its own independent investigations and inspections of the Property in making its bid. Neither the Proponent nor any of its representatives make any representations or warrantees with respect to the permissible uses of the Property, including but not limited to, the zoning of the Property. All bidders are deemed to have acknowledged that they have conducted their own due diligence in connection with the Property, and are not relying on any information provided by the Proponent or Proponent's professionals.

Deed: The Proponent shall convey the Property by delivery of a bargain and sale deed without covenants against grantor's acts.

Broker: Neither the Proponent nor the Proponent's professionals are liable or responsible for the payment of fees of any broker retained by the Purchaser.

Conduct of Sale: These Terms and Conditions of Sale will be read into the record, or specifically incorporated by reference, at the Sale of the Property. By making a bid for the Property, all bidders will be required to acknowledge these Terms and Conditions of Sale and agree to be bound by them.

Failure to Close: If the Proponent is unable to deliver title to the Property in accordance with these Terms and Conditions of Sale for any reason whatsoever or in the event that the Bankruptcy Court refuses to confirm the Proponent's Chapter 11 plan or approve the sale of the Property pursuant to Section 363 of the Bankruptcy Code, the Proponent's only obligation will be to refund the Deposit, together with interest earned thereon, if any, to the Successful Bidder, and upon such refund, the Successful Bidder will have no claim or recourse against the Proponent or the Proponent's professionals.

<u>Right to Withdraw Sale</u>:  The Proponent reserves its right to withdraw the Property from the Sale, either prior or subsequent to the Sale, for any reasonable reason, as the Proponent deems necessary or appropriate.

<u>Plan Confirmation</u>:  The Sale of the Property is subject to confirmation of the Proponent's Plan and approval by the Bankruptcy Court.

<u>Breakup Fee</u>: None

<u>Bankruptcy Court Jurisdiction</u>:  The Bankruptcy Court shall determine any disputes concerning the Sale of the Property.  By participating in the Sale, all bidders consent to the jurisdiction of the Bankruptcy Court to determine such disputes under the Debtor's pending case.

CONTRACT dated as of the _____ day of _____, 2020 (this "Contract") , between 232 Seigel Acquisition LLC ( "Seller" or "Debtor") and _____ having an address at _____ _____ ("Purchaser").

Seller and Purchaser hereby covenant and agree as follows:

1. Sale of Property

Paragraph 1.01. Seller shall sell or cause to be sold to Purchaser, and Purchaser shall purchase, at the price and upon the terms and conditions set forth in this Contract: the real property located at 232 Seigel Street, Brooklyn, New York (the "Property").  The sale of the Property includes (a) all of its appurtenances, including any estate, right, title, interest, property, claim and demand of Seller in and to all streets, alleys, rights-of-way, sidewalks, easements, any adjoining gores or strips of land and utility lines or agreements, including, without limitation, all development rights and "air rights"; (b) all improvements, buildings and structures located on or at the Property and the facilities located thereon, and any apparatus, equipment, appliances and fixtures incorporated therein and used exclusively in connection with the operation and occupancy thereof; (c)  all plans, specifications, budgets, schedules, surveys, drawings, reports and governmental applications, permits, approvals and licenses issued by any federal, state or local governmental authority or agency pertaining to the ownership, operation, maintenance, development, construction or use of  the Property (collectively, the "Plans and Permits"); and (d) all of its rights and licenses in and to use the Plans and Permits.

Paragraph 1.02.   Purchaser acknowledges that the Sale shall be conducted pursuant to an Order of the United States Bankruptcy Court for the Southern District of New York (hereinafter the "Bankruptcy Court") in Case No. 20-22845, entitled "Bidding and Auction Procedures" (hereinafter the "Bidding Procedures") which was approved by the Bankruptcy Court on _____ and is deemed annexed to this Contract.

Paragraph 1.03. Purchaser acknowledges that this sale is subject to and governed by (1) the Orders of the Bankruptcy Court, (2) the provisions of the United States Bankruptcy Code (hereinafter the "Code"), (3) the laws of the State of New York, to the extent they do not conflict with (1) and (2), above, and (4) the Bidding and Auction Procedures approved pursuant to the motion of the Seller.

2. Purchase Price, Acceptable Funds

Paragraph 2.01. The purchase price ("Purchase Price") to be paid by Purchaser to Seller for the Property is (                ) Dollars or such other bid by the Purchaser approved by the Bankruptcy Court, payable as follows:

(A) on the signing of this Contract, by Purchaser's check payable to the Escrowee (as hereinafter defined), subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to Bidding Procedures as defined in Article 3 hereof (the "Down Payment").

(B) THIS CONTRACT IS "ALL CASH" AS KNOWN IN THE COMMON PARLANCE. PURCHASER'S OBLIGATIONS UNDER THIS CONTRACT ARE NOT CONDITIONED UPON PURCHASER'S ABILITY TO SECURE FINANCING OF ANY KIND OR NATURE.

(C) The balance at Closing (as hereinafter defined) in accordance with Section 2.02 hereof (the "Cash Balance")

Paragraph 2.02. All monies payable under this Contract, unless otherwise specified herein, shall be paid by (a) certified checks of Purchaser drawn on any federally insured bank, savings bank, trust company or savings and loan association having a banking office in the City of New York; (b) official bank checks drawn by any such banking institution, payable to the order of Seller (or as Seller shall direct) and bearing no endorsements; or (c) wire transfer of immediately available federal funds. Attorney's Escrow Checks of Purchaser payable to the order of Seller (or as Seller directs) up to the amount of $1,000.00 in the aggregate shall be acceptable for sums other than the Purchase Price payable to Seller at Closing.

3. Escrow of Down Payment

Paragraph 3.01. (a) The Down Payment shall be paid by check or checks drawn to the order of and delivered to Backenroth Frankel & Krinsky LLP ("Escrowee"). The Escrowee shall hold the Down Payment in escrow in a non-interest-bearing IOLA Account until the Closing or sooner termination of this Contract and shall pay over or apply the Down Payment in accordance with the terms of this section. At the Closing, the Down Payment shall be paid by Escrowee in accordance with Bidding Procedures. If for any reason the Closing does not occur and either party makes a written demand upon Escrowee for payment of such amount, Escrowee shall give written notice to the other party of such demand. If Escrowee does not receive a written objection from the other party to the proposed payment within 10 business days after the giving of such notice, Escrowee is hereby authorized to make such payment. If Escrowee does receive such written objection within such 10-day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by written instructions from the parties to this Contract or pursuant to an order of the Bankruptcy Court. However, Escrowee shall have the right at any time to deposit the escrowed proceeds and interest, if any, thereon, with the clerk of the Bankruptcy Court. Escrowee shall give written notice of such deposit to Seller and Purchaser. Upon such deposit

2

Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that Escrowee shall not be deemed to be the agent of either of the parties, and that Escrowee shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this Contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this Contractor involving gross negligence on the part of the Escrowee.

(c) Escrowee or any member of its firm shall be permitted to act as counsel for the Seller in any dispute as to the disbursement of the Down Payment or any other dispute between the parties whether or not Escrowee is in possession of the Down Payment and continues to act as Escrowee.

(d) Escrowee acknowledges receipt of the Down Payment by certified, bank check subject to collection or wire transmission and Escrowee's agreement to these provisions by signing in the place indicated on the signature page of this contact.

4. The Closing

Paragraph 4.01. The conveyance of title to the Property by the Seller to Purchaser, and payment of the Cash Balance by Purchaser shall take place _____ days following the entry of an Order approving the Contract and the transaction embodied therein if that is a business day, and if not, the following business day (the "Closing"). The Closing is to be held at the office of the Escrowee, or such other location as designated by the Seller within the Southern or Eastern District of New York. Time is of the essence with respect to Purchaser's obligations to close title in accordance with this Contract on or before the Closing date.

5.   Acknowledgments and Representations of Purchaser

Purchaser acknowledges and represents that:

Paragraph 5.01. Purchaser has inspected the Property, made all appropriate inquiries into the previous ownership and uses of the Property, is fully familiar with the physical condition and state of repair thereof, and shall accept the Property "as is" and in their present condition, including, without limitation, the environmental conditions as reflected in the Terms of Sale annexed hereto, without any reduction of the Purchase Price for any change in such condition by any reason thereof subsequent to the date of this Contract.  The Terms of Sale set forth conditions which Purchaser agrees to accept, including any covenant, easement, and/or deed restriction, and any other future obligation relating thereto.

Paragraph 5.02. Before entering into this Contract, Purchaser has made such examination of the Property, the physical condition and state of repair thereof including the environmental conditions. Purchaser acknowledges that it is an experienced real estate owner/operator and is relying solely on its own expertise and investigations and inspections in entering into this Contract and has not been induced by and has not relied upon any representations, warranties, or statements, whether express or implied, made by Seller or any agent, employee, or other representative of Seller or by any other person representing or purporting to represent Seller or Proponent, which are not expressly set forth in this Contract, whether or not any such representations, warranties or statements were made in writing or orally.

Paragraph 5.03. In the event of any default by the Purchaser in the terms of this Contract, the damages which are due to the Seller, by reason of said default, shall be deemed liquidated in the amount of the Down Payment, as Seller's sole remedy, it being agreed that Seller's damages in case of such default might be impossible to ascertain with mathematical precision and that the Down Payment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

Paragraph 5.04. Purchaser represents that (a) it has the legal power, right and authority to enter into this Agreement and to consummate the transactions contemplated hereby and that all requisite action has been taken by Purchaser in connection with the entering into this Contract and the consummation of the transactions contemplated hereby; (b) this Contract and all documents required hereby to be executed by Purchaser are and will be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms (c) Purchaser, and all direct or indirect beneficial owners of Purchaser, are in compliance with all applicable laws, statutes, rules and regulations of any federal, state or local governmental authority in the United States of America, including the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) (the "Order") and other similar requirements contained in the rules and regulations of the Office of Foreign Asset Control, Department of the Treasury ("OFAC") and in any related enabling legislation or other Executive Orders (collectively, the "Orders"). Neither Purchaser nor any of the direct or indirect beneficial owners of Purchaser (i) is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "Lists") or is owned or controlled by, or acts for or on behalf of, any Person on the Lists or who has been determined by competent authority to be subject to the prohibitions contained in the Orders; (ii) has been arrested for money laundering or for predicate crimes to money laundering, convicted or pled nolo contendere to charges involving money laundering or predicate crimes to money laundering; or (iii) has been determined by competent authority to be subject to the prohibitions contained in the Orders; (iv) is owned or controlled by, nor acts for or on behalf of, any natural person or entity (a "Person") on the Lists or any other Person who has been determined by competent authority to be subject to the prohibitions contained in the Orders; (v) will transfer or permit the transfer of any interest in Purchaser or such parties to any Person who is, or whose beneficial owners are, listed on the Lists; or (vi) will assign this Agreement or any interest herein, to any Person who is listed on the Lists or who is engaged in illegal activities.

4

6.  Destruction, Damage or Condemnation

Paragraph 6.01. The provisions of Section 5-1311 of the General Obligations Law shall not apply to the sale and purchase provided for in this Contract and Purchaser agrees to close title to the Property regardless of any destruction, damage or condemnation that occurs after the execution and delivery of this Contract.

7.  Seller's Closing Obligations

At the closing, Seller shall execute and/or deliver or cause to be executed and/or delivered to Purchaser the following:

Paragraph 7.01. A bargain and sale deed without covenants against grantor's acts, executed by the Seller in proper form for recording so as to convey to Purchaser the fee title to the Property, subject to recorded encumbrances and the other conditions of this Contract.

Paragraph 7.02. All required New York City and State transfer tax returns executed by the Seller to be issued at the Closing and delivered to the representative of Purchaser's title company for delivery to the appropriate public officers promptly after the Closing.

Paragraph 7.03. The right to possession of the Property in condition required by this Contract, subject to the provisions hereinabove and to the provisions of the Code and the laws of the State of New York governing the rights to possession upon the conveyance of the deed subject to any Order of the Bankruptcy Court and the Bidding Procedures.  Seller shall not be obligated to bring any motion or proceeding for the purpose of obtaining possession of any part of the Property, or to remove any tenant or occupant therefrom after delivery of the Deed.

Paragraph 7.04.  Any other documents required by this Contract or by law to be delivered by Seller to consummate this transaction.

8.  Purchaser's Closing Obligations

At the Closing, Purchaser shall execute and/or deliver:

Paragraph 8.01.  The Cash Balance to the Seller.

Paragraph 8.02.  All required New York City and State transfer tax returns, and cause all such returns to be issued at the Closing and delivered to the representative of Purchaser's title company for delivery to the appropriate public officers promptly after the Closing.  Purchaser will pay any and all applicable transfer taxes and recording fees.

Paragraph 8.03.  Any other documents required by this Contract or by law or reasonably required by Seller to be executed and/or delivered by Purchaser to consummate this transaction.

9.  Apportionments

Paragraph 9.01. The parties specifically acknowledge that there shall be no apportionments made as of the date of Closing, whether for taxes, water or sewer charges, emergency repair liens, assessments, rents, fuel, or any other matters relating hereto.

10.  Objections to Sale

Paragraph 10.01. This Contract shall automatically terminate if the Court rejects the Sale or if Seller shall be unable to cause title to the Property to be conveyed to Purchaser at the Closing Date or any adjournments thereof in accordance with the provisions of this Contract and the Bidding Procedures.  Purchaser nevertheless may elect either (i) to accept such title as Seller may be able to convey, but without any abatement of or other credit to the Purchase Price or liability on the part of Seller; or (ii) to terminate this Contract. The sole liability of Seller shall be to refund the Down Payment and interest thereon, if any, to the Purchaser and this Contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability. Seller shall not be required to bring any action or proceeding or to incur any expense to cure any title defect or to enable Seller otherwise to comply with the provisions of this Contract, except as may otherwise be provided in this Contract.

Paragraph 10.02. Purchaser shall take title to the Property "as is" and subject to: any state of facts an accurate survey may show; encroachments, covenants, easements, and restrictions of record, if any; violations, fines, penalties, zoning regulations, and ordinances of the City of New York.  Purchaser is aware of and agrees to the Terms of Sale which are attached to this Contract and which are incorporated in this Contract by this reference as though fully set forth herein at length.

11.  Notices

Paragraph 11.01. All notices under this Contract shall be in writing and shall be delivered personally, by nationally recognized overnight courier, addressed to Seller's attorney at the address set forth below, and to Purchaser addressed to Purchaser's attorney at the address set forth below.

Seller's Attorney:  Backenroth Frankel & Krinsky, LLP, 800 Third Avenue, New York, New York 10022.

Purchaser's Attorney:

12.  Limitations on Survival of Representations, Warranties, Covenants and other Obligations

Paragraph 12.01. Except as otherwise expressly set forth in this Contract, no representations, warranties, covenants or other obligations of Seller and/or Purchaser set forth herein shall survive the Closing except as specifically provided to survive, and no action based

thereon shall be commenced after the Closing except as to such representations specifically provided to survive.

Paragraph 12.02. The delivery of the deed by the Seller and the acceptance thereof by Purchaser shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations, if any, of Seller which are expressly stated in this Contract to survive.

13. Assignment of Contract

Paragraph 13.01.  Purchaser shall not assign this Contract or its rights hereunder without the prior written consent of the Proponent, whose consent will not be unreasonably withheld or delayed. Additionally, Purchaser may assign its rights under this Contract, but only immediately before the Closing and only simultaneously with the payment of the Cash Balance, to any wholly owned subsidiary of Purchaser, or to any entity in which Purchaser, or its principals, has an equity interest of at least fifty-one (51%) percent and control of management (a "Controlled Entity"), upon appropriate proof of same delivered to Proponent.  Any purported assignment without Proponent's consent or that is not to a Controlled Entity with proof of such relationship given to Proponent shall be void.  Any sale, transfer or assignment of any interests in Purchaser will be deemed an assignment of this Contract and is subject to the same conditions as an assignment of this Contract. Nevertheless, an assignment of Purchaser's rights under this Contract, if and when consented to by Proponent, shall not be effective unless and until an executed counterpart of the instrument of assignment and of an assumption agreement by the assignee shall have been delivered to Seller.

Paragraph 13.02.  Seller shall assign pending tax certiorari actions, if any, to Purchaser without any representations or warranties, and without any further obligation of Seller, except to execute such documents as may be necessary to effectuate such assignment.

14. Miscellaneous Provisions

Paragraph 14.01 THE PROVISIONS OF THE BIDDING PROCEDURES AND THE ORDERS OF THE COURT ARE A PART OF THIS CONTRACT. ANY CONFLICT WITH SUCH IN THIS CONTRACT WILL NOT BE DEEMED TO AMEND OR ALTER SAID PROCEDURES OR ORDERS.

Paragraph 14.02. Subject to the provisions of Paragraph 14.01, this Contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated hereby, and all prior agreements, understandings, representations and statements, oral or written, are merged into this Contract. Neither this Contract nor any provision hereof may be waived, modified, amended, discharged, or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in such instrument.

Paragraph 14.03.  This Contract shall be governed by, and construed in accordance with, the Bankruptcy Code and the Orders of the Bankruptcy Court and, where it does not conflict with the Bankruptcy Code or any Order of the Bankruptcy Court, the laws of the State of New York. The Bankruptcy Court shall have the exclusive jurisdiction to determine any disputes concerning the sale of the Property or any other matters under this Contract.

Paragraph 14.04. The captions in this Contract are inserted for convenience or reference only and in no way define, describe, or limit the scope or intent of this Contract or any of the provisions hereof.

Paragraph 14.05. This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

Paragraph 14.06. This Contract shall not be binding or effective until properly executed and delivered by Seller and Purchaser, together with all amounts required to be paid pursuant to 2.0l (A) hereto.  This Contract may be executed in counterparts each of which will constitute an original and all of which, when taken together, will constitute one and the same agreement.  A signed counterpart of this Contract delivered by electronic transmission will be treated as an original.

Paragraph 14.07. As used in this Contract, the masculine shall include the feminine and neuter, the singular shall include the plural, and the plural shall include the singular, as the context may require.

Paragraph 14.08. Subject to Paragraph 14.01, if the provisions of any schedule or rider to this Contract are inconsistent with the provisions of this Contract, the provisions of such schedule or rider shall prevail.

IN WITNESS WHEREOF, the parties hereto have executed this Contract as of the date first above written.

Seller:                                                       Purchaser:


By: _____          By: _____
    Name:                                                        Name:
    Title:                                                           Title:

Backenroth Frankel & Krinsky, LLP,
Escrowee:


By: _____
          Name:
          Title:

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re                                                     Chapter 11

      232 Seigel Acquisition LLC,              Case No.  20-22845


      Debtor.
--------------------------------------------------------x

## <u>NOTICE OF SALE</u>


      PLEASE TAKE NOTICE, that upon the application of 232 Seigel Acquisition
LLC ("Debtor"), the real property located at 232 Seigel Street, Brooklyn, New York (the
"Property") shall be sold to the highest bidder at an auction sale to be conducted on
_____, 2020 at _____ at the offices of Backenroth Frankel & Krinsky, LLP,
800 Third Avenue, New York, New York 10022.  The Property shall be sold "as is."  Bidding
shall be limited to all cash offers, and the minimum opening bid shall be $18,000,000, and
bidding shall be increments of $50,000. All prospective bidders shall be required to deposit
$$1,000,000 (the "Deposit") in escrow with the undersigned by bank check or wire deposit on or
before _____, 2020 at 5:00 p.m.  Subject to approval at a hearing ("Hearing") to be held
on _____ at _____ __.m. before the Honorable Robert D. Drain at the United
States Bankruptcy Court, 300 Quarropas Street, White Plains, NY 10601−5008, the highest
bidder shall be the purchaser (the "Purchaser") of the Property, free and clear of all liens, claims
and encumbrances, with any such liens, claims and encumbrances to attach to the proceeds of
sale.  The Deposit shall be non-refundable. In the event the Purchaser closes on or before
_____ after the entry of an order approving the sale, the Deposit shall be applied
to the purchase price.  In the event Purchaser fails to close on or before fifteen days after the
entry of an order approving the sale, the Deposit shall be remitted to the Debtor.  Time shall be
of the essence in the closing of this transaction.  In the event Purchaser fails to close as set forth
herein, then the Debtor shall have the right to accept the bid next highest in amount to the
original Purchaser's bid.

      PLEASE TAKE FURTHER NOTICE, that a complete copy of the terms and
conditions of sale is attached to the Debtor's Chapter 11 plan filed in the Bankruptcy Court and
is available upon request of the undersigned.

Dated: New York, New York
      _____, 2020

                                      Backenroth Frankel & Krinsky, LLP
                                      800 Third Avenue
                                      New York, New York 10022
                                      (212) 593-1100

# EXHIBIT B

## ASSETS AND LIABILITIES UNDER PLAN

| Assets | |
|---|---|
| Property | $18,000,000 |

| Liabilities | |
|---|---|
| Administrative Expense Claims | $150,000 |
| Unclassified Priority Claims | $0.00 |
| Class 1 Real estate tax Liens. | $0.00 |
| Class 2 DB Seigel LLC | $5,250,000 |
| Priority Claims under Sections 507(a)(2),(3),(4),(5),(6), and (7) of the Bankruptcy Code. | $0 |
| General Unsecured Claims | $6,397,010 |
| Interest Holders | $6,202,990 |
| **Total** | $18,000,000 |

## CHAPTER 7 LIQUIDATION ANALYSIS

| Assets | |
|---|---|
| Property | $18,000,000 |

| Liabilities | |
|---|---|
| Administrative Expense Claims | $1,950,000 |
| Unclassified Priority Claims | $0.00 |
| Class 1 Real estate tax Liens. | $0.00 |
| Class 2 DB Seigel LLC | $5,250,000 |
| Priority Claims under Sections 507(a)(2),(3),(4),(5),(6), and (7) of the Bankruptcy Code. | $0 |
| General Unsecured Claims | $6,397,010 |
| Interest Holders | $4,,402,990 |
| **Total** | $18,000,000 |

Note: All Claim amounts subject to objection.

**PURCHASE AND SALE AGREEMENT**

**Dated as of February 26, 2020**

**By and Among**

**232 SEIGEL ACQUISITION LLC**

**as Seller**

**232 SEIGEL PROPERTY, LLC**

**as Purchaser**

# PURCHASE AND SALE AGREEMENT

**PURCHASE AND SALE AGREEMENT** (this "Agreement") is entered into as of the 26 day of February, 2020 (the "Effective Date"), by and among 232 Seigel Acquisition LLC, a New York limited liability company, ("Seller"), and, 232 Seigel Property, LLC, a New York limited liability company ("Purchaser").

## RECITALS:

A.      Seller is the owner of certain real property having the street address 232 Seigel Street, Brooklyn, New York, more particularly described on **Exhibit "A"** (the "Land").

B.      Seller desires to sell and Purchaser wishes to purchase the Land and all improvements thereon, if any, upon the terms and conditions set forth below in this Agreement.

## AGREEMENT:

**NOW, THEREFORE**, in consideration of the foregoing Recitals, and the mutual agreements herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

## ARTICLE 1
## DEFINED TERMS AND THE PROJECT

1.1      Defined Terms.

"Claiming Party" shall have the meaning assigned thereto in Section 6.3.

"Closing" shall have the meaning assigned thereto in Section 2.1.

"Closing Date" shall have the meaning assigned thereto in Section 2.1.

"Closing Documents" shall have the meaning assigned thereto in Section 5 .1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Cut-Off Time" shall have the meaning assigned thereto in Schedule 7.

"Deed" shall mean the Bargain and Sale Deed (without covenant against grantor's acts), as further described in Section 5 .1.1.

"Defaulting Party" shall have the meaning assigned thereto in Section 6.3.

"Down Payment" shall have the meaning assigned thereto in Section 2.2.1.

"Effective Date" shall mean the meaning assigned thereto in the Preamble of this Agreement.

"Governmental Permits" shall have the meaning assigned thereto in Section 1.2.6.

"Improvements" shall have the meaning assigned thereto in Section 1.2.3.

"Independent Architect" means an independent licensed architect selected by Seller, which has not otherwise been employed by Seller and/or an affiliate thereof in the last five (5) years and having at least ten (10) years current and active experience in hotel construction projects located in New York City, New York, which such architect shall be subject to Purchaser's reasonable approval.

"Notice" shall have the meaning assigned thereto in Section 13.1.

"Overnight Delivery" shall have the meaning assigned thereto in Section 13.1.

"Permitted Exceptions" shall have the meaning assigned thereto in Section 4.1(a).

"Person" means any natural person, partnership, corporation, association, limited liability company, trust or any other legal entity.

"Personal Property" shall have the meaning assigned thereto in Section 1.2.4.

"Property" shall have the meaning assigned thereto in Section 1.2.

"Property Information" shall have the meaning assigned thereto in Section 13.6(c).

"Purchase Price" shall have the meaning assigned thereto in Section 2.2.

"Purchaser" shall have the meaning assigned thereto in the Preamble of this Agreement.

"Purchaser's Representatives" shall have the meaning assigned thereto in Section 13.6(c).

"Real Property" shall have the meaning assigned thereto in Section 1.2.3.

"Seller" shall have the meaning assigned thereto in the Preamble of this Agreement.

"Title Company" shall mean a nationally known title insurance company licensed to do business in New York or an abstract company licensed to do business in the State of New York acting as agent for a nationally known title insurance company.

"Voluntary Liens" shall have the meaning assigned thereto in Section 4.1(c).

1.2    Purchase and Sale. Subject to and in accordance with the provisions of this Agreement, Seller agrees to sell, assign, transfer, grant and convey the Property to Purchaser, and Purchaser agrees to purchase all of Seller's right, title and interest in and to the Property from Seller, for the Purchase Price and upon the terms and conditions herein set forth. The "Property" consists of the following:

1.2.1    Land. The Land.

1.2.2    Certain Rights. (i) All development rights, air rights, riparian rights, easements, rights-of-way, rights of ingress and egress, licenses or other

interests in or to any land, highway, street, road, avenue, strips and gores, open or proposed, in, on, across, abutting or adjoining the Land and any awards in connection therewith and (ii) all other rights, benefits, privileges, easements, tenements, hereditaments, and appurtenances, if any, thereon or in any way appertaining to the Land.

     1.2.3    <u>Improvements</u>. All fixtures and improvements, if any, located on the Real Property (the "<u>Improvements</u>"; together with the Land, collectively, the "<u>Real Property</u>").

     1.2.4    <u>Personal Property</u>. All of the personal property, if any, owned by Seller and located on or in the Property. All of the foregoing items in this Section 1.2.4 are referred to collectively as the "<u>Personal Property</u>". The term "<u>Personal Property</u>" shall not include insurance policies, utility deposits, operating bank accounts or any reserve accounts including those relating to taxes or insurance.

     1.2.5    [Intentionally Omitted.]

     1.2.6    <u>Governmental Permits</u>. Any transferable consents, authorizations, variances, or waivers, certificates, licenses, permits for the discharge of treated waste, use of the Property or otherwise, and approvals from any governmental or quasi-governmental agency, department, board, commission, bureau or other entity or instrumentality in respect of the Property heretofore or hereafter held by or granted to Seller or Seller's agents with respect to the Property to the extent assignable (excluding any operating permits or governmental permits that are not assignable) used in or related to the use, maintenance, repair, renovation, management, ownership, occupancy and operation of all or any part of the Property ("<u>Governmental Permits</u>").

     1.2.7    <u>Department of Building Plans</u>. All transferable plans filed with the New York City Department of Buildings (the "<u>DOB</u>") including, but not limited to, all plans filed and associated with Job No. 320625249, Job Filing No. 321479477, and Job Filing No. 32198145 (collectively referred to herein as the "<u>Job Filings</u> or "<u>Plans</u>").

## ARTICLE 2
## PURCHASE, CLOSING, AND PURCHASER'S RIGHT TO PERFORM CONSTRUCTION

2.1    <u>Closing</u>.

     2.1.1    The closing of title to the Property and the consummation of the purchase and sale of the Property (the "Closing") ") shall take place at the offices of Cohen & Gresser LLP, 800 Third Avenue, New York, New York (or at the office of Purchaser's lender or Purchaser's lender's counsel so long as such office in located in New York City, New York) on May 21, 2020. Purchaser acknowledges and agrees that **TIME SHALL BE OF THE ESSENCE** with respect to the

performance by Purchaser of its obligations to purchase the Property, pay the Purchase Price and otherwise consummate the transactions contemplated hereby on the date for which the Closing Date is scheduled as set forth in the immediately preceding sentence

2.2     **Purchase Price**.  Subject to applicable apportionments, adjustments and credits set forth in this Agreement, the total purchase price that Purchaser agrees to pay for the Property is EIGHTEEN MILLION DOLLARS ($18,000,000.00) (the "Purchase Price") Seller and Purchaser agree that Two Million and 00/100 Dollars ($2,000,000.00) of the Purchase Price is allocated to nonaccountable Seller cost reimbursement.  Subject to the provisions of Articles 4, 5 and 7 hereof, the Purchase Price shall be paid by Purchaser as follows:

    2.2.1     No later than one (1) business days after the Effective Date, Purchaser shall pay to Seller, by wire transfer of immediately available Federal funds, the sum of ONE MILLION EIGHT HUNDRED THOUSAND AND 00/100 DOLLARS ($1,800,000.00) (the "Down Payment").  Upon delivery to Seller, the Down Payment shall become non-refundable to Purchaser and fully earned by Seller.

    2.2.2     At the Closing, the balance ( the "Balance") of the Purchase Price, subject to the apportionments, adjustments and credits referenced in Article 7 shall be payable by federal funds wire transfer of immediately available funds ("Funds") to an account or accounts at such bank or banks as shall be designated by Seller.  Cohen & Gresser LLP shall hold funds, if any, that are required to be escrowed at Closing.

    2.2.3     Purchaser expressly agrees and acknowledges that Purchaser's obligations hereunder are not in any way conditioned upon or qualified by Purchaser's ability to obtain financing of any type or nature whatsoever (i.e., whether by way of debt financing or equity investment, or otherwise) to consummate the transaction contemplated hereby.

2.3     **Construction Rights and Reimbursement Obligations**.  Upon the Effective Date, the Purchaser shall be entitled to commence any and all construction it deems necessary or appropriate to carry out the Job Filings and Plans as the Purchaser deems necessary and appropriate in the Purchaser's sole and exclusive discretion ("Purchaser Construction").  The Seller hereby authorizes the Purchaser to take such actions as noted herein in the name of the Seller.  In the event of a termination of this Contract of Sale as a result of a default by Seller then in addition to all other remedies of Purchaser in the Contract of Sale, the Seller shall also be obligated to reimburse the Purchaser for all direct third party costs incurred in performing the construction after the Effective Date as evidenced by standard construction documentation and paid receipts provided by Purchaser to Seller.  Purchaser shall carry such insurance and with limits for similar projects in New York, New York of no less than as required by the DOB.

## ARTICLE 3
## PROPERTY "AS IS"

3.1     As-is Condition.

(a)     Subject to the provisions and obligations, if any, as set forth in the Purchaser's Rider, Purchaser acknowledges that Purchaser has ascertained for itself the value and condition of the Property, and Purchaser is not relying on, nor has Purchaser been influenced by, any representation of Seller, or any agent or representative of Seller, regarding the value, condition or any aspect of the Property, other than as expressly set forth in this Agreement or the Closing Documents.  If this Agreement required Seller to make any representation or warranty, express or implied (beyond those set forth in this Agreement or the Closing Documents), relating to the Property, or to accept any greater liability with respect to the Property, Seller would have required a materially higher Purchase Price for the Property or refused to sell the Property. Purchaser agrees that Purchaser's satisfaction or waiver of Purchaser's contingencies is Purchaser's acknowledgment that it has had every opportunity to conduct whatever inspection, test, or analysis of the Property Purchaser deemed to be relevant to its decision to purchase the Property.  Seller shall not be responsible for any failure to investigate the Property on the part of any person.

(b)     PURCHASER ACKNOWLEDGES THAT EXCEPT AS MAY BE SET FORTH IN THIS AGREEMENT AND THE CLOSING DOCUMENTS, NEITHER SELLER NOR ANY REAL ESTATE BROKER, AGENT, OFFICER, EMPLOYEE, MEMBER, SHAREHOLDER, ATTORNEY OR REPRESENTATIVE OF SELLER HAS MADE ANY REPRESENTATIONS WHATSOEVER REGARDING THIS TRANSACTION, INCLUDING WITHOUT LIMITATION, ANY WARRANTIES, EXPRESS OR IMPLIED, AS TO THE CONDITION OR STATE OF REPAIR OF THE PROPERTY OR ANY PORTION THEREOF, INCLUDING, BUT NOT LIMITED TO ANY PHYSICAL, ENGINEERING OR ENVIRONMENTAL CONDITION OF THE PROJECT, OR OF VISIBLE OR HIDDEN DEFECTS IN MATERIAL, WORKMANSHIP OR CAPACITY OF THE PROJECT OR ANY PORTION THEREOF, OR OF ANY ECONOMIC RESULTS TO BE OBTAINED OR PREDICTED IN THE OWNERSHIP AND OPERATION OF THE PROJECT, INCLUDING, BUT NOT LIMITED TO ANY REVENUES GENERATED BY THE PROPERTY AND EXPENSES INCURRED IN ITS OPERATION, AND THERE ARE NO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AS TO THE PROJECT OR ANY PORTION THEREOF.  PURCHASER FURTHER ACKNOWLEDGES THAT, SUBJECT TO THE REPRESENTATIONS AND WARRANTIES OF SELLER CONTAINED HEREIN OR IN THE CLOSING DOCUMENTS EXECUTED BY SELLER, PURCHASER IS EXPERIENCED IN REAL ESTATE MATTERS AND HAS MADE ITS OWN EVALUATION CONCERNING THE VALUE OF THE PROPERTY (INCLUDING ITS PHYSICAL CONDITION AND INCOME POTENTIAL), (I) DELIVERY OF THE PROPERTY AT CLOSING WILL BE "AS IS, WHERE IS" AND WITH ALL FAULTS, SUBJECT TO ORDINARY WEAR AND TEAR, AND (II) SELLER HAS DISCLAIMED ANY EXPRESS OR IMPLIED WARRANTIES WITH RESPECT TO THE PROJECT OR ANY ECONOMIC RESULTS TO BE OBTAINED IN THE FUTURE FROM THE OWNERSHIP AND OPERATION OF THE PROJECT.

(c)     Except as set forth in the Purchaser's Rider, Seller makes no representation or warranty with respect to the presence of Hazardous Materials on, above or beneath the Land (or any parcel in proximity thereto) or in any water on or under the Property.  The term "Hazardous Materials" shall mean (a) those substances included within the definitions of any one or more of the terms "hazardous materials", "hazardous wastes", "hazardous substances", "industrial

wastes", and "toxic pollutants", as such terms are defined under the Environmental Laws, or any of them, (b) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof, (c) natural gas, synthetic gas and any mixtures thereof, (d) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable, (e) polychlorinated biphenyl ("PCBs") or PCB-containing materials or fluids, (f) radon, (g) any other hazardous or radioactive substance, material, pollutant, contaminant or waste, and (h) any other substance with respect to which any Environmental Law or governmental authority requires environmental investigation, monitoring or remediation. The term "Environmental Laws" shall mean all federal, state and local laws, statutes, ordinances and regulations, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees and binding judgments relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et sec .) , the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et sec .), the Resource Conservation and Recovery Act, as amended (42 U.S.C. §§ 6901 et seq.), the Toxic Substance Control Act, as amended (15 U.S.C. §§ 2601 et seq.), the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f et m.), any state or local counterpart or equivalent of any of the foregoing, and all state and federal common law, and any federal, state or local transfer of ownership notification or approval statutes.

(d)    This Agreement including the Purchaser's Rider and the Closing Documents, as written, contain all the terms of the agreement entered into between the parties as of the Effective Date, and Purchaser acknowledges that, except for any representations and warranties expressly set forth in this Agreement and the Closing Documents, neither Seller nor any of Seller's affiliates, nor any of their agents or representatives, has made any representations or held out any inducements to Purchaser, and Seller hereby specifically disclaims any representation, oral or written, past, present or future, other than those specifically set forth in this Agreement or in the Closing Documents. Without limiting the generality of the foregoing, except as set forth in this Agreement and in the Closing Documents, Purchaser has not relied on any representations or warranties, and neither Seller nor any of Seller's affiliates, nor any of their agents or representatives has made or is willing to make any representations or warranties, express or implied, other than as expressly set forth in this Agreement or in the Closing Documents, as to (i) the status of title to the Property, (ii) the current or future real estate tax liability, assessment or valuation of the Property, (iii) the potential qualification of the Property for any and all benefits conferred by any laws whether for subsidies, special real estate tax treatment, insurance, mortgages or any other benefits, whether similar or dissimilar to those enumerated, (iv) the compliance of the Property in its current or any future state with applicable Laws or any violations thereof, including, without limitation, those relating to access for the handicapped, environmental or zoning matters, and the ability to obtain a change in the zoning or a variance in respect to the Property' non-compliance, if any, with zoning laws, (v) the nature and extent of any right-of-way, lease, possession, lien, encumbrance, license, reservation, condition or

otherwise, (vi) the availability of any financing for the purchase, alteration, rehabilitation or operation of the Property from any source, including, without limitation, any government authority or any lender, (vii) the future use of the Property, including, without limitation, the use of the Property for hotel or other purposes, (viii) the present and future condition and operating state of any Personal Property and the present or future structural and physical condition of the improvements, their suitability for rehabilitation or renovation, or the need for expenditures for capital improvements, repairs or replacements thereto, or (ix) the actual or projected income or operating expenses of the Property.

(e)     Purchaser acknowledges that Seller has afforded Purchaser the right to full and complete investigations, examinations and inspections of the Property and delivered or made available to Purchaser all Property Information that it has requested in connection with its evaluation of the purchase of the Property and its due diligence in connection therewith. Purchaser acknowledges and agrees that, except as set forth in this Agreement or in the Closing Documents, (i) the information and materials delivered or made available to Purchaser and Purchaser's Representatives by Seller or Seller's affiliates, or any of their agents or representatives may have been prepared by third parties and may not be the work product of Seller or any of Seller's affiliates; (ii) neither Seller nor any of Seller's affiliates may have made any independent investigation or verification of, or have any knowledge of, the accuracy or completeness of, any such information and materials that have not been prepared by or with the active involvement of Seller or its respective affiliates; and (iii) any further distribution of any such information and materials is subject to Section 14.6.

(f)     Purchaser acknowledges it has visited the Property and that Purchaser has undertaken a thorough inspection of the Property and the Property Information that it has requested in connection with its evaluation of the purchase of the Property and its due diligence in connection therewith. Subject to and except for the representations, warranties and covenants expressly set forth in this Agreement or in the Closing Documents, Seller shall not be liable or bound in any manner by any oral or written information pertaining to the Property furnished by Seller, Seller's affiliates, their agents or representatives, any real estate broker, or other person.

(g)     Seller has specifically bargained for the assumption by Purchaser (subject to Seller's representations and warranties set forth in this Agreement and in the Closing Documents) of all responsibility to investigate the Property, Laws and Regulations, Rights, Facts and Violations and of all risk of adverse conditions and has structured the Purchase Price and other terms of this Agreement in consideration thereof. Purchaser has undertaken all such investigations of the Property, Laws and Regulations, Rights, Facts and Violations as Purchaser deems necessary or appropriate under the circumstances as to the status of the Property and based upon same, Purchaser is and will be relying strictly and solely upon such inspections and examinations, and the advice and counsel of its own consultants, agents, legal counsel and officers, and Seller's representations and warranties set forth in this Agreement and/or the Closing Documents.

(h)     Intentionally Omitted.

**ARTICLE 4**
**TITLE REVIEW, TITLE COSTS**

4.1     Exceptions to Title; Title Matters.

(a)     The Property is sold and shall be conveyed subject only to the following matters (collectively, the "Permitted Exceptions"):

(i)     All currently existing and future liens for unpaid real estate taxes and water and sewer charges not due and payable as of the Closing Date, subject to adjustment as hereinafter provided;

(ii)     All present and future zoning, building, environmental and other laws, ordinances, codes, restrictions and regulations of all governmental authorities having jurisdiction with respect to the Property, including, without limitation, landmark designations and all zoning variances and special exceptions, if any (collectively, "Laws and Regulations").

(iii)     All covenants, restrictions and rights, provided same do not prevent the maintenance and use of the Property as currently utilized and provided same do not render title to the Premises uninsurable at regular rates without the payment of additional premiums.

(iv)     All easements and agreements for the erection or maintenance of water, gas, steam, electric, telephone, sewer or other utility pipelines, poles, wires, conduits or other like facilities, and appurtenances thereto, over, across and under the Property provided same are not violated by the existing Improvements (collectively, "Rights") provided same do not render title to the Premises or uninsurable at regular rates without the payment of additional premiums..

(v)     The state of facts that an accurate survey of the Property would show (collectively, "Facts").

(vi)     Intentionally Omitted.

(vii)     All violations of building, fire, sanitary, environmental, housing and similar municipals Laws and Regulations whether or not noted or issued as of the Closing Date(collectively, "Violations"); provided, however that Seller shall make a good faith effort to clear all Violations by the date of Closing and, only for those Violations in which Seller could not clear and which do not relate to Purchaser Construction, the Seller shall provide to the Purchaser a credit against the Purchase Price for all monetary fines, interest, and penalties with respect to such uncleared Violations.  Notwithstanding the foregoing, Seller shall pay, at Closing, the amount of fines, penalties and interest for Violations that have been reduced to a sum certain and which do not relate to Purchaser Construction.

(viii)     Consents of record as of the date hereof by Seller or any former owner of the Property for the erection of any structure or structures on, under or above any street or

streets on which the Property may abut provided that same are not violated by the existing Improvements and do not interfere with the existing use, operation and maintenance of such Improvements or provided same do not render title to the Premises uninsurable at regular rates without the payment of additional premiums.

(ix)    Minor encroachments and/or minor projections, not exceeding twelve inches, of stoop areas, roof cornices, window trims, vent pipes, cellar doors, steps, columns and column bases, flue pipes, signs, piers, lintels, window sills, fire escapes, satellite dishes, protective netting, sidewalk sheds, ledges, fences, coping walls (including retaining walls and yard walls), air conditioners and the like, if any, on, under or above any street or highway, the Property or any adjoining property that do not materially restrict, prohibit or impair the present use, operation and maintenance of the Property and provided same do not render title to the Premises uninsurable at regular rates without the payment of additional premiums.

(x)    Minor variations, not exceeding twelve inches, between tax lot lines and lines of record title.

(xi)    A restriction in the Deed (hereinafter defined) to be delivered to Purchaser at Closing substantially in the form attached hereto as **Exhibit "B"** prohibiting use of the Property as a homeless shelter and otherwise as set forth in **Exhibit "B"**.

(xii)    Exceptions shown on Schedule B of that certain Title Commitment, designated as Title No. RANY-37290 from Riverside Abstract Company on behalf of Old Republic Title Insurance Company as attached hereto as Schedule 4.

(xiii)    Any other matter that the Title Company may raise as an exception to title provided the Title Company, at no additional cost to Purchaser, will omit the same as exceptions or uninsurable at regular rates without the payment of additional premiums.

(b)    Purchaser agrees to cause title to the Property to be examined by the Title Company, and shall direct the Title Company to deliver copies of such title report (the "Title Report") to Seller's attorney contemporaneously with the delivery of same to Purchaser. Delivery of the Title Report to the Seller's Attorney shall be deemed notice to the Seller's Attorney of all objections to title of the Property.

(c)    If, on the Closing Date, Seller is unable to convey to Purchaser title to the Property subject to and in accordance with the provisions of this Agreement, Seller shall be entitled, upon written notice delivered to Purchaser on or prior to the Closing Date, to reasonable adjournments of the Closing one or more times for a period not to exceed forty-five (45) days in the aggregate to enable Seller to convey title to the Property in accordance with the terms of this Agreement. If Seller does not so elect to adjourn the Closing, or if at the adjourned date Seller is unable to convey title subject to and in accordance with the provisions of this Agreement, Purchaser shall be entitled, to terminate this Agreement by written notice to Seller delivered on or promptly after the date scheduled for the Closing, in which event Purchaser shall be entitled to a prompt return of the Down Payment (which obligation shall survive any such termination), and this Agreement shall be deemed terminated and of no further effect, and neither party hereto

shall have any obligations to the other hereunder or by reason hereof, except for the provisions hereof that expressly survive termination of this Agreement. Notwithstanding anything to the contrary contained in this Agreement, Seller shall not be required to take or bring any action or proceeding to remove any defect in or objection to title or to expend any moneys therefor, nor shall Purchaser have any right of action against Seller therefor, at law or in equity, except that Seller shall, on or prior to the Closing, pay, discharge or remove of record or cause to be paid, discharged and removed of record, if such is recorded, at Seller's sole cost and expense all of the following items: (a) Voluntary Liens (as hereinafter defined), which obligation is unlimited; (b) Violations, except as specifically set forth in Section 4.1(a)(vii), and (c) other liens encumbering the Property (other than open real estate taxes, water and sewer charges that are subject to adjustment in accordance with Article 7 hereof and other than Permitted Exceptions), including federal, state and municipal tax liens, judgments, fines and penalties that (i) are in liquidated amounts and may be satisfied solely by the payment of money (including the preparation or filing of appropriate satisfaction instruments in connection therewith) and (ii) do not exceed in the aggregate up to the sum of Three Hundred Sixty Thousand Dollars ($360,000.00) (the "Cure Cap"). The term "Voluntary Liens" as used herein shall mean liens and other encumbrances (other than Permitted Exceptions) that Seller has knowingly or intentionally suffered or allowed to be placed on the Property, including, without limitation, mortgages and mechanic's liens, but shall expressly exclude judgments and federal, state and municipal tax liens.

(d)  Notwithstanding anything in Section 4.1(c) above to the contrary, Purchaser may at any time accept such title as Seller can convey, without reduction of the Purchase Price or any credit or allowance on account thereof or any claim against Seller, except for a credit for liens encumbering the Property that are in liquidated amounts, provided in no event shall such credit exceed the Cure Cap other than with respect to Seller's obligation to remove Voluntary Liens. The acceptance of the Deed (as hereinafter defined) by Purchaser shall be deemed to be full performance of, and discharge of, every agreement and obligation on Seller's part to be performed under this Agreement, except for such matters which are expressly stated to survive the Closing hereunder.

(e)  The amount of any unpaid taxes, assessments and water and sewer charges which Seller is obligated to pay and discharge may, at the option of Seller, be paid by Purchaser out of the balance of the Purchase Price, if bills therefor with any interest and penalties thereon figured to said date are furnished to or obtained by the Title Company at the Closing and the Title Company omits same as an exception to its title policies.

(f)  If the Property shall, at the time of the Closing, be subject to any liens (such as for judgments or transfer, inheritance, estate, franchise, license or other similar taxes), encumbrances or other title exceptions which would be grounds for Purchaser to reject title hereunder, the same shall not be deemed an objection to title provided that, at the time of the Closing, either (a) Seller pays at the Closing, in form reasonably satisfactory to the Title Company, the amount required to satisfy the same and delivers to Purchaser or the Title Company at the Closing instruments in recordable form (and otherwise in form reasonably satisfactory to the Title Company in order to omit same as an exception to its title policy) sufficient to satisfy and discharge of record such liens and encumbrances together with the cost of recording or filing such instruments, or (b) the Title Company, at no additional cost to Purchaser, will otherwise issue or bind itself to issue a

policy, that will insure Purchaser against collection thereof from or enforcement thereof against the Property and, if required by Purchaser's lender, omit same from any lender's policy to be issued to Purchaser's lender at the Closing.

(g)     On or before Closing, Seller shall terminate or modify the Easement (as defined in Schedule 4) as necessary to extinguish the rights granted therein to Seller by 215 Moore ST Acquisition LLC and S&B Moore LLC and amend the ZLDA (as defined in Schedule 4) and such other documents of record necessary to reflect such termination or modification and all such recorded documents will be deemed "Permitted Exceptions."

(h)     On or before Closing, Seller shall cause the amendment or modification of the ZLDA to the extent necessary or desirable to reflect the Deed restriction set forth in **Exhibit "B"** hereto and any such amendment or modification shall be deemed a "Permitted Exception."

(i)     On or before Closing, Seller shall amend the ZLDA to include "cooperation" provisions requiring the owner of the Property to cooperate with other parties to the ZLDA seeking Uniform Land Use Review Procedure ("ULURP") and DOB approvals and an agreement by the owner of the Property not to oppose any ULURP or other approvals requested by other parties to the ZLDA and all such recorded documents shall be deemed "Permitted Exceptions."

## ARTICLE 5
## CLOSING PROCEDURE

5.1     Seller's Performance.  At Closing, Seller shall deliver to Purchaser all of the following (collectively, the "Closing Documents"):

5.1.1     Deed.  A bargain and sale deed without covenants against grantor's acts (the "Deed"), duly executed and acknowledged by Seller in recordable form.

5.1.2     Title Affidavit.  An affidavit requested by the Title Company, duly executed by Seller, in form and substance as generally used by the Title Company for such transactions.

5.1.3     FIRPTA Certificate.  A certificate of non-foreign status, duly executed and acknowledged by Seller, in accordance with Section 1445 of the Code.

5.1.4     Closing Statement.  A counterpart, duly executed by Seller, of a closing statement conforming to the payments, apportionments and adjustments to be made pursuant to the provisions of this Agreement.

5.1.5     State Transfer Tax Return.  A New York State Combined Real Estate Transfer Tax Return, Credit Line Mortgage Certificate, and Certification of Exemption from the Payment of Estimated Personal Income Tax, Form TP-584, for the conveyance of the Property (the "State Transfer Tax Return"), duly executed by Seller.

5.1.6     City Transfer Tax Return.  A New York City Department of Finance Real Property Transfer Tax Return for the conveyance of the Property (the "City Transfer Tax Return"), duly executed and sworn to or affirmed by Seller.

5.1.7     Transfer Report.  A New York State Real Property Transfer Report, Form RP-5217NYC (the "Transfer Report"), duly executed by Seller.

5.1.8     Other Documents and Instruments.  Such other documents and instruments as are expressly contemplated hereunder and such other reasonable documents as are customarily executed in the jurisdiction in which the Property is located in connection with the conveyance of real property and any other documents as reasonably may be required by the Title Company and necessary to consummate this transaction and to otherwise effect the agreements of the parties to this Agreement, duly executed and acknowledged by Seller as required.

5.1.9     Payment of Certain Costs.  Deliver to the Title Company or other applicable party the amount of money required for the payment of such costs, expenses and other items as are required to be paid by Seller hereunder.

5.1.10    Readings.  Seller shall order a reconciliation from the DEP (and any other requested department or agency) and final meter readings on all meters affecting the Property dated within ten (10) business days of the Closing Date.

5.1.11    Seller's Authority.  Deliver to the Title Company such proof of Seller's authority and authorization to enter into this Agreement and the transactions contemplated hereby, and such proof of the power and authority of the individual(s) executing and/or delivering any instruments, documents or certificates on behalf of Seller to act for and bind Seller, as may be reasonably required by Title Company.

5.1.12    Additional Documents and Materials.  A Release of Lien from all contractors or subcontractors as well as Karl Fisher & Associates the architect and Fruma Narov the engineer who have performed work on the Property.  A bring down certificate whereby the Seller confirms accuracy of representations in all material respects to Purchaser.  A License Agreement in the form as annexed hereto at **Exhibit C.**

5.2     Purchaser's Performance.  Purchaser shall deliver to Seller, or the applicable party described below, all of the following, the delivery of which shall be a condition to Seller's obligation to consummate the sale of the Property.

5.2.1     Payment of Purchase Price and Other Amounts.  Payment to Seller, by wire transfer of immediately available funds, of (a) the cash portion of the Purchase Price, adjusted for the prorations and credits hereinafter provided for and reduced by the Down Payment and (c) all other amounts payable by Purchaser to Seller pursuant to the terms of this Agreement.

5.2.2     Payment of Certain Costs.  Deliver to the Title Company or other applicable party the amount of money required for the payment of such costs, expenses and other items as are required to be paid by Purchaser hereunder.

5.2.3     Intentionally Omitted.

5.2.4     State Transfer Tax Return.  The State Transfer Tax Return, duly executed and sworn to or affirmed by Purchaser.

5.2.5     City Transfer Tax Return.  The City Transfer Tax Return, duly executed and sworn to or affirmed by Purchaser.

5.2.6     Transfer Report.  The Transfer Report, duly executed by Purchaser.

5.2.7     Organizational Documents and Authority Documents.  A resolution authorizing the transaction described in this Agreement and Purchaser's execution and delivery of all documents required hereunder to be delivered by Purchaser at Closing, which resolution shall be signed by all members required to authorize the transaction and certified by the manager or managing member of the Purchaser as true, correct, complete and in full force and effect.

5.2.8     Other Documents and Instruments.  Such other documents and instruments as are expressly contemplated hereunder and such other reasonable documents as are customarily executed in the jurisdiction in which the Property is located in connection with the conveyance of real property and any other documents as reasonably may be required by the Title Company and necessary to consummate this transaction and to otherwise effect the agreements of the parties to this Agreement.

5.2.9     Power of Attorney.  A Power of Attorney duly executed and acknowledged by Purchaser in recordable form and in form and substance satisfactory to Seller in favor of Toby Moskovits granting Toby Moskovits the authority to execute on behalf of Purchaser and its successors all documents necessary or desirable to effectuate the rezoning and development of 215 Moore Street, Brooklyn, New York so long as Purchaser can build a hotel on the Property in accordance with the approved plans on file with the New York City Department of Buildings as of the date of this Agreement (the "Approved Plans").

5.3     Certain Costs and Expenses.

    5.3.1    Purchaser's Expenses. Purchaser shall pay or cause to be paid all costs and expenses of whatever kind and nature incurred by Purchaser in connection with the transactions contemplated herein, including, without limitation, (i) Purchaser's legal fees, (ii) fees for recording and filing the deed, any mortgage or any other document, (iii) Purchaser's title insurance premiums (including any endorsements and loan policies requested by Purchaser's lender), search costs and other charges by the Title Company, (iv) survey costs, (v) financing costs, (vi) mortgage recording taxes, if any, and recording fees payable with respect to mortgages, (vii) any and all costs incurred by Purchaser in connection with the exercise of its rights hereunder, (viii) all commissions due by Purchaser to the Broker (as defined below) and (ix) any and all other costs and expenses as are incurred by Purchaser in connection with the transactions described herein. Nothing contained in this paragraph or elsewhere in this Agreement shall be deemed or construed to mean that Purchaser's obligations under this Agreement are subject to Purchaser's obtaining any loan commitment or financing.

    5.3.2    Seller's Expenses. Seller shall pay or cause to be paid: (i) Seller's legal fees, (ii) the New York State Real Property Transfer Tax and the New York City Real Property Transfer Tax, upon or payable in connection with the transfer of title to the Property and the recordation of the Deed, (iii) all commissions due by Seller to the Broker (as defined below); and (iv) any and all other costs and expenses as are incurred by Seller in connection with the transactions described herein

    5.3.3    Survival. The provisions of this Section 5.3 shall survive the Closing for a period of 6-months.

## ARTICLE 6
## CONDITIONS TO CLOSING

6.1     Conditions to Obligations of Purchaser. The obligations of Purchaser to execute and deliver the applicable closing documents, to pay the Purchase Price and to perform Purchaser's other obligations at the Closing under this Agreement are and shall be subject to the satisfaction of each of the following conditions at or prior to the Closing, unless otherwise specified:

    (a)    Seller shall have executed, where applicable, and delivered to Purchaser the Closing Documents to be executed and delivered by Seller, if necessary, pursuant to this Agreement.

    (b)    On the Closing Date, title to the Property shall be free of encumbrances other than Permitted Exceptions.

    (c)    All of the representations and warranties of Seller contained in this Agreement shall have been true and correct in all material respects when made, and shall be true and correct in all material respects on the Closing Date with the same effect as if made on and as of such date.

(d)     Seller shall have performed, observed, and complied in all material respects with all covenants, agreements, and conditions required by this Agreement to be performed, observed, and complied with on Seller's part prior to or as of the Closing Date.

(e)     There shall have occurred no Casualty or Condemnation under Article 11 (or, if any has occurred, Purchaser shall not have given a Casualty Termination Notice or Condemnation Termination Notice as permitted in Article 11).

(f)     A title company shall be willing to issue a title insurance policy at Closing for the full amount of the Purchase Price, subject only to the Permitted Exceptions.

(g)     All other material conditions to Purchaser's obligations that are specifically set forth in this Agreement shall have been fulfilled.

6.2     <u>Conditions to Obligations of Seller</u>.  The obligations of Seller to execute and deliver the applicable Closing Documents and to perform Seller's other obligations at the Closing under this Agreement are and shall be subject to the satisfaction of each of the following conditions at or prior to the Closing:

(a)     All of the representations and warranties of Purchaser contained in this Agreement shall have been true and correct in all material respects when made.

(b)     Purchaser shall have performed, observed and complied in all material respects with all covenants, agreements, and conditions required by this Agreement to be performed, observed, and complied with on Purchaser's part on the Closing Date with the same effect as if made on and as of such date.

(c)     Purchaser shall have paid the Purchase Price pursuant to and in accordance with the provisions of this Agreement.

(d)     Purchaser shall have executed where applicable, and delivered to Seller, the Closing Documents to be executed and delivered by Purchaser.

6.3     <u>Failure of a Condition</u>.  In the event that a condition is not satisfied under Section 6.1 and is not due to a default, act or omission by Seller, or under Section 6.2 and is not due to a default, act or omission by Purchaser, and Purchaser under Section 6.1 or Seller under Section 6.2 shall elect not to close due to such failure, then, subject to the next sentence, this Agreement shall terminate, the Down Payment shall be returned to Purchaser (which obligation shall survive any such termination), and neither Purchaser nor Seller shall have any obligations or duties to the other under this Agreement except for those obligations that expressly survive such termination as set forth in this Agreement.  Notwithstanding anything contained in this Section 6.3 to the contrary, in the event that the reason for either Purchaser electing not to close is under Section 6.1 or Seller electing not to close under Section 6.2, and such reason also gives rise to Purchaser having a claim for a default by Seller under Section 10.2 or Seller having a claim for a default by Purchaser under Section 10.1, then in such event, the party claiming such default (the "<u>Claiming Party</u>") against the other party (the "<u>Defaulting Party</u>") may elect not to close and proceed against the Defaulting Party and enforce the Claiming Party's rights under Article 10.

## ARTICLE 7
## PRORATIONS/ ADJUSTMENTS

The parties agree that the pro rations and adjustments described on <u>Schedule 7</u> attached hereto and made a part hereof shall be made between the parties at the Closing. The provisions of <u>Schedule 7</u> shall survive the Closing.

7.1     <u>Intentionally Omitted</u>.

7.2     <u>Intentionally Omitted</u>.

7.3     <u>Tax Proceedings</u>.  From and after the date hereof until the Closing, Seller is hereby authorized to continue any proceeding or proceedings now pending for the reduction of the assessed valuation of the Property, and in Seller's sole discretion at its sole cost and expense to litigate or settle same; provided, however, that Purchaser shall be entitled to that portion of any refund relating to the period occurring after the Closing after payment to Seller of all costs and expenses, including, without limitation, reasonable attorneys' fees and disbursements, incurred by Seller in obtaining such refund.  Purchaser shall deliver to Seller, reasonably promptly after request therefor, receipted tax bills and canceled checks used in payment of such taxes and shall execute any and all consents or other documents, and do any act or thing necessary for the collection of such refund by Seller.  Any refunds or credits due for the periods prior to Purchaser's ownership of the Property shall remain the sole property of Seller.  Each party agrees to reasonably cooperate with the other party and to execute any and all documents reasonably requested by such other party in furtherance of the prosecution or completion of any proceeding.  The provisions of this Section 7.3 shall survive the Closing.

## ARTICLE 8
## OPERATIONS PRIOR TO CLOSING; SPECIAL AGREEMENTS

8.1     <u>Maintenance</u>.     Subject to the provisions herein concerning repairs and replacements in the event of condemnation or casualty, until Closing, Seller, at Seller's expense, shall maintain the Property in its present condition, subject to normal wear and tear.

8.2     <u>Seller's Mortgage</u>.  If Purchaser obtains financing for its acquisition of the Property, then Seller shall use commercially reasonable efforts to cause its lender to assign its mortgages to Purchaser's lender at Closing.  At Closing, if Purchaser obtains such financing, then Purchaser shall cause its lender to accept an assignment of Seller's mortgages from its existing lender, provided that Seller shall satisfy the indebtedness related to any such mortgage. The amount of Fifty Percent (50%) of whatever the amount of the savings of mortgage recording tax as a result of such assignment shall be reimbursed to Seller by Purchaser at Closing.

8.3     <u>Purchaser Covenant</u>.  Purchaser covenants and agrees that for a period of fourteen (14) months following the Closing Date, Purchaser will not submit or seek any amendments to the Approved Plans with the New York City Department of Buildings or any other governmental or quasi-governmental agency.

## ARTICLE 9
## REAL ESTATE COMMISSION

9.1     Real Estate Broker.  Each of Purchaser and Seller represents and warrants to the other that neither it nor any of its their respective officers, directors, shareholders, partners, agents, or employees, as the case may be, have employed the services of any real estate broker, investment banker, agent or finder (howsoever characterized) in connection with this Agreement or the sale of the Property or any part thereof other than Newmark Knight Frank ("Broker").  At Closing, each of Seller and Purchaser shall pay Broker a commission whereby the Purchaser has agreed to pay a commission in the sum total of Zero Point Five Percent (0.5%) of the Purchase Price and Seller has agreed to pay a commission in the sum total of One Percent (1.0%), in each case pursuant to the terms of a separate agreement.

9.2     Indemnity.  Purchaser and Seller each agrees to indemnify and hold the other harmless from all claims, actual or threatened, of any broker, investment banker, agent or finder (howsoever characterized) arising by reason of the indemnifying party's breach of its representation, warranty and/or covenant set forth in Section 9.1.  The indemnities provided in this Section 9.2 shall survive any termination of this Agreement for any reason whatsoever and the Closing and delivery of the Deed.

## ARTICLE 10
## DEFAULT AND REMEDIES

10.1     Purchaser's Default; Liquidated Damages.  If Closing fails to occur by reason of Purchaser's failure or refusal to pay the Purchase Price or perform its other material obligations hereunder due at Closing for any reason other than Seller's default of its material obligations hereunder, then Seller may immediately terminate this Agreement and retain the Down Payment as full liquidated damages by giving Notice of Purchaser's default to Purchaser.  The Down Payment shall be liquidated damages and not a penalty and the retention of same shall be the sole and exclusive, right, recourse, claim and remedy for of the Seller arising out of or relating to this Agreement.  Purchaser and Seller each acknowledge that it would be difficult to ascertain the actual damages as to loss of the value of the bargain, certain carrying costs and other indirect costs which would be suffered by Seller if Purchaser defaults in consummating the purchase and sale contemplated by this Agreement.  It is agreed by the parties that the Down Payment represents a reasonable estimate of the probable loss to Seller resulting from any such default by Purchaser in proceeding to Closing.  Upon payment of the Down Payment to Seller, neither party to this Agreement shall have any further liability to the other and this Agreement shall be and become null and void and of no further force and effect, either at law or in equity, except for the provisions hereof which expressly survive the Closing or sooner termination of this Agreement.

10.2     Seller's Default.  If the Closing fails to occur by reason of Seller's failure or refusal to perform its obligations hereunder, then Purchaser shall have the right to:

(a)     Terminate this Agreement and receive the Down Payment (which obligation shall survive any such termination) by giving Seller Notice of Seller's default and Purchaser's election to terminate this Agreement, in which event the Seller promptly shall refund the Down Payment to Purchaser.  In such event, this Agreement shall be terminated and the parties shall be released

and relieved of all obligations hereunder except the provisions hereof which expressly survive the termination of this Agreement; and/or

      (b)    commence an action for specific performance; or

      (c)    waive Seller's default and proceed to consummate the transactions contemplated by this Agreement.

Except as set forth in Section 10.2(b) and 2.3 above, Purchaser hereby expressly waives, relinquishes and releases any other right or remedy it has at law, in equity or otherwise by reason of Seller's default hereunder, including without limitation Purchaser's right to recover damages from Seller.

**ARTICLE 11**
**CONDEMNATION AND CASUALTY**

      (a)    If, prior to the Closing Date any portion of the Property is taken by eminent domain (or is the subject of a pending taking which has been formally commenced or a written notice of the intention to commence has been received), then Seller shall notify Purchaser of such fact promptly after obtaining knowledge thereof, and Purchaser shall have the right to terminate this Agreement by giving notice to Seller delivered not later than ten (10) days after Purchaser's receipt of Seller's notice, and, upon delivery of such notice, this Agreement shall terminate, the Down Payment shall be returned to Purchaser (which obligation shall survive any such termination) and neither party shall have any other or further obligation to the other hereunder except for obligations that expressly survive the Closing or the sooner termination of this Agreement in accordance with the terms of this Agreement. If Purchaser does not elect to timely terminate this Agreement as aforesaid, then this Agreement shall continue in full force and effect, provided that, Seller shall assign to Purchaser (without recourse or any representation or warranty) at the Closing the rights of Seller to the awards, if any, for the taking, and Purchaser shall be entitled to contest the award and to receive and keep all awards for such taking of the Property or such portion thereof and shall pay to Purchaser any award (less Seller's actual, reasonable, out-of-pocket cost of obtaining same) received by Seller prior to the Closing. Seller shall not be permitted to compromise or otherwise settle any such award without the express written consent of the Purchaser, to be given or withheld in its sole and absolute discretion if Purchaser elects not to terminate this Agreement as set forth above.

      (b)    If, prior to the Closing Date, a material part (as defined below) of the Property is destroyed or damaged by fire or other casualty, then Seller shall promptly notify Purchaser of such fact and Purchaser shall have the right to terminate this Agreement by giving notice to Seller delivered not later than thirty (30) days after Purchaser's receipt of Seller's notice, and, upon delivery of such notice, this Agreement shall terminate, the Down Payment shall be returned to Purchaser (which obligation shall survive any such termination) and neither party shall have any other or further obligation to the other hereunder except for obligations that expressly survive the Closing or sooner termination of this Agreement in accordance with the terms of this Agreement. For the purposes hereof, a "material part" of the Property shall mean damage to a portion of the Property for which the cost to repair the damage thereto or destruction thereof is reasonably estimated by an Independent Architect selected by Seller and which is

reasonably satisfactory to Purchaser to exceed Eight Hundred Seventy Five-Thousand and 00/100 Dollars ($875,000.00).

(c)     If Purchaser does not timely elect to terminate this Agreement in accordance with the terms of this <u>Section 11(b)</u>, or if there is damage to or destruction of an "immaterial part" (i.e., anything other than a material part) of the Property by fire or other casualty, then Purchaser shall have no right to terminate this Agreement, there shall be no abatement of the Purchase Price and Seller shall assign to Purchaser (without recourse or any representation or warranty) at the Closing the rights of Seller to the proceeds (excluding any business interruption proceeds applicable to the period prior to the Closing), if any, payable under Seller's insurance policy covering the affected Property with respect to such damage or destruction, Purchaser shall be credited with the amount of any deductible under Seller's insurance policy that is applicable to such fire or other casualty, Seller shall reasonably cooperate with Purchaser's efforts to collect any and all proceeds available under such insurance policies and Purchaser shall be entitled to receive and keep any amounts received from such insurance policies (excluding any business interruption proceeds relating to the period prior to the Closing) by Seller or Purchaser except to the extent Seller has, with Purchaser's consent, not to be unreasonably withheld, actually applied the proceeds to restore, stabilize, repair or safeguard the affected Property.

(d)     The Closing Date shall be adjourned for a reasonable period (not to exceed thirty (30) days) to allow the Independent Architect sufficient time to make the cost estimates required to be performed by the Independent Architect under this <u>Section 11</u>. Seller covenants to maintain in full force and effect the casualty insurance policy currently maintained by Seller (or substantially equivalent coverage) for the period commencing on the Effective Date through and including the Closing Date. The provisions of this subsection are intended to supersede any and all statutory provisions that may govern a purchaser's rights in the event of a condemnation or casualty.

The terms of this <u>Section 11</u> shall survive the Closing.

## ARTICLE 12
## REPRESENTATIONS WARRANTIES AND COVENANTS OF SELLER

12.1     <u>Representations Warranties and Covenants of Seller</u>. Seller hereby represents and warrants the following as of the date hereof and as of the Closing Date:

12.1.1     <u>Authority, Enforceability and Non-Contravention</u>. Seller is a limited liability company duly formed, validly existing and in good standing under the laws of the State of New York. This Agreement and all other documents executed and delivered, or to be executed and delivered, by Seller in connection with the transactions contemplated herein, including, but not limited to the Closing Documents, have been duly executed and delivered and constitute the legal, valid and binding obligations of Seller enforceable in accordance with their respective terms and provisions; Seller has taken all action, corporate, partnership, limited liability company or otherwise, required to authorize its execution, delivery and performance of this Agreement, the Closing Documents and such other documents as are appropriate to convey the Property in accordance with the terms and

conditions of this Agreement; and neither the execution nor delivery of this Agreement or the Closing Documents nor the consummation of the transactions contemplated herein will conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, Seller's Organizational Documents or any other agreement or instrument to which Seller is a party or to which it is bound or any court order, judgment, statute, ordinance, rule, regulation, order or other government requirement.

12.1.2 <u>Compliance with Laws and Ordinances</u>.  The execution and delivery of this Agreement by Seller and the consummation by Seller of the transaction herein contemplated, do not and will not conflict with any applicable law, ordinance, regulation, statute, rule or restriction or any judgment, order, writ, injunction, decree or ruling of any court or other governmental entity or other Person to which Seller is subject or bound or any other agreement to which Seller is a party or by which Seller is bound.

12.1.3 <u>Litigation</u>.  Except as set forth on <u>Schedule 12.1.3</u> annexed to this Agreement, no action, suit, claim, investigation or proceeding, whether legal or administrative or in mediation or arbitration, is pending, or to Seller's knowledge, has been threatened in writing, at law or in equity, against the Seller or the Property before or by any court or federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality.  There are no judgments, decrees or orders entered on a suit or proceeding against Seller, which materially and adversely affects Seller's ability to perform its obligations pursuant to, or Seller's rights under, this Agreement, or which seeks to restrain, prohibit, invalidate, set aside, rescind, prevent or make unlawful this Agreement or the carrying out of this Agreement or the consummation of this transaction.

12.1.4 <u>FIRPTA</u>.  Seller is not a foreign person within the meaning of Section 1445 of the Code.

12.1.5 <u>Tax Cert</u>.  Except as set forth on <u>Schedule 12.1.5</u>, there are no actions or proceeding pending nor shall any be commenced with respect to the contesting of or reduction of taxes affecting the Property.

12.1.6 <u>Judgments etc</u>.  To the best of the Seller's knowledge, there are no judgments, orders, or decrees of any kind against Seller unpaid or unsatisfied of record, nor any actions, suits or other legal or administrative proceedings pending or, to the best of Seller's actual knowledge, threatened against Seller, which would have any material adverse effect on the ability of Seller to consummate the transactions contemplated by this Agreement.

12.1.7 [Intentionally Omitted]

12.1.8 <u>Options, Etc</u>.  No person or entity has a right of first refusal or option to purchase with respect to the Property or Land and/or any part thereof.

12.1.9     Exclusive Assumption.  Except for the Permitted Exceptions, there is no document, instrument or agreement (i) which cannot be terminated on thirty (30) days' notice without payment of any termination fee or other compensation for early termination, and (ii) which the Purchaser is required to take subject to or be bound by.  There is no management agreement with respect to the ownership, use or operation of the Property or any portion thereof.

12.1.10     Condemnation, Etc.  Seller has received no written notice of any (i) pending, threatened or contemplated annexation, eminent domain or condemnation proceedings, or private purchase in lieu thereof, affecting or which may affect the Property, or any part thereof, (ii) proposed or pending proceeding to change or redefine the zoning classification of all or any part of the Property, or (iii) proposed or pending special assessments affecting the Property or any portion thereof.

12.1.11     Tax Abatement.  The Property is not subject to and has not been subject to any tax abatement or exemption.

12.1.12     No Violation.  The execution, delivery and performance of this Agreement by Seller will not contravene or result in a violation of or default under (a) any of the provisions of the organizational documents of Seller, or (b) any resolution adopted by Seller, or (c) to the extent not also binding on Purchaser, any court order, judgment, statute, ordinance, rule, regulation, orders or other governmental requirement, or (d) under any contract, indenture, agreement or understanding to which Seller is a party.

12.1.13     Consents.     Any authorization, consent or approval of, or registration or filing with, any governmental authority that is required to have been obtained or made by Seller in connection with, the execution, delivery or performance of this Agreement has been (or will be as of the Closing Date) duly obtained or made.

12.1.14     Enforceable Agreement.  This Agreement is a valid and binding Agreement of Seller enforceable against Seller in accordance with its terms, except as limited by applicable bankruptcy, insolvency, moratorium, reorganization and laws affecting the rights of creditors generally, and except as limited by equitable principles of general application.

12.1.15     Certain Treasury Department Identifications.  Seller represents and warrants that as of the date of this Agreement and as of the date of Closing, (a) Seller is not and shall not be named as a "Specially Designated National and Blocked Person" as designated by the United States Department of the Treasury's Office of Foreign Assets Control or as a person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; (b) Seller is not and shall not be owned or controlled, directly or indirectly, by the government of any country that is subject to a United States Embargo; (c) Seller is not acting and shall not act, directly or indirectly, for or on

behalf of any person, group, entity or nation named by the United States Treasury Department as a "Specially Designated National and Blocked Person", or for or on behalf of any person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; and (d) Seller is not and shall not be engaged in this transaction directly or indirectly on behalf of, or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity or nation.

        12.1.16   <u>Bankruptcy</u>.  Seller has not (i) made a general assignment for the benefit of creditors, (ii) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by Seller's creditors against it, (iii) suffered the appointment of a receiver to take possession of all, or substantially all, of Seller's assets, which remains pending, or (iv) suffered the attachment or other judicial seizure of all, or substantially all, of Seller's assets, which remains pending.  To Seller's knowledge, no petition in bankruptcy has been filed against it, nor has any petition or application for the appointment of a receiver of any of its properties or assets been filed, which has not been fully discharged.

        12.1.17   <u>Title to Personal Property</u>.  Seller has good and valid title to all Personal Property to be transferred to Purchaser at Closing which shall, subject to Permitted Exceptions, be free and clear of all liens and encumbrances as of the Closing.

    12.2   <u>Survival.</u>  The representations and warranties of Seller set forth in this Article 12 and anywhere else in this Agreement (unless expressly stated otherwise) shall expire upon the delivery of the Deed from Seller to Purchaser.

    12.3   <u>Representations Warranties and Covenants of Purchaser</u>.  Purchaser hereby represents and warrants the following as of the date hereof and on the Closing Date:

        12.3.1   <u>Organization</u>.  Purchaser is a corporation duly formed, validly existing and in good standing under the laws of the State of New York.  This Agreement and all other documents executed and delivered, or to be executed and delivered, by Purchaser in connection with the transactions contemplated herein have been or will be at Closing duly executed and delivered and constitute the legal, valid and binding obligations of Purchaser enforceable in accordance with their respective terms and provisions, subject to bankruptcy, insolvency and other laws generally affecting creditor's rights; Purchaser has taken or will take all action, corporate, partnership or otherwise, required to authorize its execution, delivery and performance of this Agreement and such other documents as are appropriate to purchase the Property in accordance with the terms and conditions of this Agreement; and neither the execution nor delivery of this Agreement nor the consummation of the transactions contemplated herein will conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, the organizational documents of Purchaser or any agreement or instrument to which Purchaser is a party or any court order, judgment, statute, ordinance, rule, regulation, order or other government requirement.  Except as set forth in Section 12.3.3, no

22

consent or approval of any person, firm, corporation or governmental authority is required to be obtained by Purchaser in order for Purchaser to enter into this Agreement or any of the documents set forth herein, or to perform fully all of Purchaser's obligations under this Agreement or under any such other document, and to purchase the Property by Purchaser, except with respect to those provisions of this Agreement that expressly require the consent of a third party.

12.3.2    No Violation.    The execution, delivery and performance of this Agreement by Purchaser will not contravene or result in a violation of or default under (a) any of the provisions of the organizational documents of Purchaser, or (b) any resolution adopted by Purchaser, or (c) to the extent not also binding on Seller, any court order, judgment, statute, ordinance, rule, regulation, orders or other governmental requirement, or (d) under any contract, indenture, agreement or understanding to which Purchaser is a party.

12.3.3    Consents.    Any authorization, consent or approval of, or registration or filing with, any governmental authority that is required to have been obtained or made by Purchaser in connection with, the execution, delivery or performance of this Agreement has been (or will be as of the Closing Date) duly obtained or made.

12.3.4    Judgments etc.    To the best of Purchaser's knowledge, there are no judgments, orders, or decrees of any kind against Purchaser unpaid or unsatisfied of record, nor any actions, suits or other legal or administrative proceedings pending or, to the best of Purchaser's actual knowledge, threatened against Purchaser, which would have any material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement.

12.3.5    [Intentionally Omitted].

12.3.6    Enforceable Agreement.    This Agreement is a valid and binding Agreement of Purchaser enforceable against Purchaser in accordance with its terms, except as limited by applicable bankruptcy, insolvency, moratorium, reorganization and laws affecting the rights of creditors generally, and except as limited by equitable principles of general application.

12.3.7    Certain Treasury Department Identifications.    Purchaser represents and warrants that as of the date of this Agreement and as of the date of Closing, (a) Purchaser is not and shall not be named as a "Specially Designated National and Blocked Person" as designated by the United States Department of the Treasury's Office of Foreign Assets Control or as a person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; (b) Purchaser is not and shall not be owned or controlled, directly or indirectly, by the government of any country that is subject to a United States Embargo; (c) Purchaser is not acting and shall not act, directly or indirectly, for or on behalf of any person, group, entity or nation named by the United States Treasury Department as a "Specially Designated National and Blocked Person", or

for or on behalf of any person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; and (d) Purchaser is not and shall not be engaged in this transaction directly or indirectly on behalf of, or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity or nation.

12.3.8   Survival.   The representations and warranties of Purchaser set forth in this Article 12 and anywhere else in this Agreement (unless expressly stated otherwise) shall expire upon the delivery of the Deed from Seller to Purchaser.

## ARTICLE 13
## MISCELLANEOUS

13.1   Notices.   Any Notices required or permitted to be given under this Agreement (each a "Notice") shall not be effective unless in writing and (a) delivered by hand, (b) sent by a nationally recognized overnight courier service (e.g., Federal Express) ("Overnight Delivery") or (c) sent by certified or registered mail, return receipt requested, and addressed as follows, and shall be deemed to have been given, upon the date of actual delivery (or either refusal to accept delivery by the intended recipient or the first attempted delivery which cannot be completed due to the intended recipient's failure to provide notice of a change in address) at the physical address or e-mail address, as applicable, specified below:

If to Seller:

> c/o Toby Moskovits
> Heritage Equity Partners
> 679 Driggs Avenue
> Brooklyn, New York 11211
> Attn:  Toby Moskovits

with a copy to:

> Cohen & Gresser LLP
> 800 Third Avenue
> New York, New York  10022
> Attention:  Nicholas J. Kaiser, Esq.

If to Purchaser:

> _____
> _____
> _____
> _____
> _____

with a copy to:

Kishner Miller Himes P.C.
40 Fulton Street, 12th Floor
New York, New York 10038
Attention: Ryan O. Miller, Esq.

or such other address as either party may from time to time specify in writing to the other in the manner aforesaid. A Notice may be given by a party or by a party's attorney at law. Any Notice intended to initiate a response period shall be effective to do so only if such Notice identifies such response period.

13.2    <u>Successors and Assigns</u>. This Agreement shall be binding upon, and inure to the benefit of, the parties to this Agreement and their respective successors, heirs, administrators and assigns, except that Purchaser's interest under this Agreement or the beneficial interests in Purchaser, may not be assigned, encumbered or otherwise transferred whether voluntarily, involuntarily, by operation of law or otherwise, without the prior written consent of Seller in its absolute and sole discretion.

13.3    <u>No Third-party Beneficiary</u>. Nothing in this Agreement, express or implied, shall give to anyone, other than the parties to this Agreement and their respective permitted successor and assigns, any benefit, or any legal or equitable right, remedy or claim, under or in respect of this Agreement or the escrow contemplated hereby.

13.4    <u>Waiver; Modification</u>. Failure by Purchaser or Seller to insist upon or enforce any of their respective rights hereunder shall not constitute a waiver thereof, except as provided for herein. No waiver of or modification or amendment to any of the provisions of this Agreement shall be valid unless in writing and executed by the parties against whom such waiver, modification or amendment is sought to be enforced.

13.5    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of law.

13.6    <u>Confidentiality</u>.

(a)    Prior to the Closing, all Property Information and any information provided by Seller, and any third party reports (such as environmental reports) prepared by Purchaser in connection with the transaction contemplated hereunder, shall be kept strictly confidential and shall not, without the prior written consent of the party providing such information, be disclosed by Purchaser or its respective representatives, in any manner whatsoever, in whole or in part, to any person other than prospective investors and lenders and to its and their respective attorneys' accountants and other professionals and vendors assisting in the evaluation of and prosecution of the transactions described in this Agreement, and will not be used by the applicable party or their representatives, directly or indirectly, for any purpose other than evaluating the Property, its suitability for ownership, investment, purchase, management, by Purchaser or third parties, or providing investment or financing by third parties, and the transactions described in this Agreement. Purchaser agrees that the Property Information shall, prior to Closing, remain

Seller's property and that, upon the termination of this Agreement, Purchaser shall return all such Property Information to Seller or furnish Seller with a letter from a principal of Purchaser responsible for the Property Information certifying that the Property Information in its possession has been destroyed. Each party further agrees that their representatives and such other parties shall be advised of the confidential nature of the Property Information or Purchaser information and shall be directed to treat such information with strictest confidence and not to disclose such information except as otherwise provided herein. Each party acknowledges that it will be liable for any breach of the provisions of this section by any of their respective representatives. The provisions of this Section 13.6 shall in no event apply to Property Information or Purchaser information which is a matter of public record or is otherwise available generally to the public, or has previously been disclosed by any other person, and shall not prevent such party from complying with Laws, including, without limitation, governmental, regulatory, disclosure, tax and reporting requirements, or with respect to obtaining any required license or permit.

(b)    Purchaser and Seller, for the benefit of each other, hereby agree that, between the date hereof and the Closing Date, they will not release or cause or permit to be released any press notices, publicity (oral or written) or advertising promotion relating to, or otherwise announce or disclose or cause or permit to be announced or disclosed, in any manner whatsoever, the terms, conditions or substance of this Agreement (except in confidence to actual or prospective investors, Purchaser Affiliates, potential lenders, or other professionals or consultants retained by Purchaser or any of such persons) or the transactions contemplated herein, without first obtaining the written consent of the other party to this Agreement which shall not be unreasonably withheld, conditioned or delayed. It is further agreed that after the Closing Date, any press release issued shall be subject to prior review of the other party, but in no event shall any such press release issued by either party disclose the identity of either party's beneficial owners by name or the consideration paid for the Property. It is understood that nothing contained in this Agreement shall preclude either party from discussing or disclosing the substance or any relevant details of the transactions contemplated in this Agreement or the Property Information with any of its attorneys, accountants, professionals, consultants or potential investors or lenders, as the case may be, or with any prospective manager, or prevent either party to this Agreement from complying with Laws, including, without limitation, governmental, regulatory, disclosure, tax and reporting requirements.

(c)    As used in this Agreement, the term "Property Information" shall mean all other information, documents and other materials in any way relating to the Property, the operation thereof or the sale thereof that may be furnished to, or otherwise made available for review by, Purchaser or its directors, officers, employees, affiliates, partners, members, brokers, agents or other representatives, including, without limitation, any prospective manager, attorneys, accountants, contractors, consultants, engineers and financial advisors and investors (collectively, "Purchaser's Representatives"), by Seller or any of Seller's affiliates, or their agents or representatives, including, without limitation, their contractors, engineers, attorneys, prospective lenders, lenders' attorneys, prospective managers, accountants, consultants, brokers or advisors, or which Purchaser may obtain by reason of any examinations or inspections of the Property.

(d)    The provisions of this Section 13.6 shall survive the termination of this Agreement.

13.7    [Intentionally Omitted].

13.8    Partial Invalidity.  If any provision or provisions in this Agreement is found by a court of law to be in violation of any applicable local, state or federal ordinance, statute, law, administrative or judicial decision, or public policy, and if such court should declare such portion, provision or provisions of this Agreement to be illegal, invalid, unlawful, void or unenforceable as written, then such portion, provision or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this Agreement shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained therein, and that the rights, obligations and interest of Purchaser and Seller under the remainder of this Agreement shall continue in full force and effect.

13.9    Foreign Investment.  Purchaser and Seller agree to comply with any and all reporting requirements applicable to such party with respect to the transactions contemplated by this Agreement which are set forth in any law, statute, ordinance, rule, regulation, order or determination of any governmental authority, including but not limited to, The International Investment Security Act of 1976, The Foreign Investment in Property Tax Act of 1980 and the Tax Reform Act of 1984 and further agrees upon written request of the other party to furnish it with evidence of such compliance (if applicable).

13.10    Merger of Prior Agreements.  This Agreement (including the exhibits and any schedule to this Agreement) constitutes the entire agreement between and understanding of the parties with respect to the purchase and sale of the property specifically described herein and supersedes all prior and contemporaneous (whether oral or written) agreements and understandings between the parties to this Agreement relating to the specific subject matter hereof.

13.11    Headings.  The paragraphs or section headings herein are for convenience of reference only and shall not be deemed to vary the content of this Agreement or terms, provisions, covenants or conditions hereof.

13.12    Including.  The word "including" shall be deemed followed by the phrase "without limitation" where the context requires or permits unless already followed by words of similar effect.

13.13    No Recordation.  Neither party shall file or record against the Property or otherwise this Agreement or any memorandum thereof.

13.14    Execution in Counterparts.  This Agreement and any amendments or modifications to this Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Agreement or amendment, as applicable.  To facilitate execution of this Agreement or any such amendments or modifications, the parties may execute and exchange by e-mail PDF counterparts of the signature pages of this Agreement or such amendments or modifications.

13.15    Further Assurances.  In addition to the acts and deeds recited herein and contemplated to be performed, executed and/or delivered by Seller to Purchaser at Closing,

Purchaser and Seller agree to perform, execute and/or deliver or cause to be delivered, executed and/or delivered, but without any obligation to incur any additional liability or expense, on or after the Closing any and all further reasonable acts, deeds and assurances as may be reasonably necessary to consummate the transactions contemplated hereby and/or to further perfect and deliver to Purchaser the conveyance, transfer and assignment of the Property and all rights related thereto.

13.16 <u>Construction</u>. The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement and any exhibits or amendments thereto.

13.17 <u>Calculation of Time Periods</u>. Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designed period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday in the State of New York, or a Jewish Holiday (as hereinafter defined), in which event the period shall run until the end of the next day which is neither a Saturday, Sunday, legal holiday in the State of New York or Jewish Holiday. The last day of any period of time described herein shall be deemed to end at 5:00 p.m. Eastern Standard/Daylight Savings Time. A "business day" as used in this Agreement means any day other than a Saturday, Sunday, a legal holiday in the State of New York or a Jewish Holiday. As used herein, the term "Jewish Holiday" means the first two (2) and last two (2) days of Passover, the two (2) days of Shavuot, the two (2) days of Rosh Hashana, Yom Kippur, Shemini Atzeret and Simchat Torah, provided, however, that the days of such Jewish Holidays shall be calculated by including in such holiday the date upon which such holiday commences at or about sunset.

13.18 <u>Effectiveness of Agreement</u>. This Agreement shall not become effective until executed and delivered by Purchaser, Seller and the Escrow Agent and receipt by the Escrow Agent of the Down Payment.

13.19 [<u>Intentionally Omitted</u>].

13.20 <u>Like-Kind Exchange</u>. Seller and Purchaser acknowledge and agree that the purchase and sale of the Property may be part of a tax-free exchange for either Purchaser or Seller pursuant to Section 1031 of the Code, the regulations promulgated thereunder, revenue procedures, pronouncements and other guidance issued by the Internal Revenue Service. Each party hereby agrees to cooperate with the other and take all reasonable steps on or before the Closing Date to facilitate such exchange if requested by the other party, provided that (a) no party making such accommodation shall be required to acquire any substitute property, (b) such exchange shall not affect the representations, warranties, liabilities and obligations of the parties to each other under this Agreement, (c) no party making such accommodation shall incur any additional cost, expense or liability in connection with such exchange (other than expenses of reviewing and executing documents required in connection with such exchange), and (d) no dates in this Agreement will be extended as a result thereof, except as specifically provided herein.

13.21 <u>Distribution of Interests</u>. Notwithstanding anything to the contrary contained in this Agreement, at any time prior to the Closing, Seller shall be permitted to distribute to one or more of its members or to an entity controlled by one or more of its members (collectively, "<u>Distributees</u>") direct ownership interests in the Property, such that the Property will thereafter be owned and held by Seller and/or the Distributees as tenants-in-common, and at Closing Purchaser shall purchase the Property from Seller and/or such Distributees, as applicable. If required, Purchaser shall reasonably cooperate with Seller upon Seller's written request in effecting any such transactions prior to the Closing, provided that Purchaser shall not assume any additional liabilities or obligations in connection therewith and any additional reasonable costs and expenses incurred by Purchaser as a result thereof (which would not have otherwise been incurred by Purchaser in connection with an outright sale of the Property by Seller), shall be borne by Seller.

13.22 <u>Acknowledgement</u>. Except as provided in this Agreement to the contrary, Purchaser acknowledges and agrees that: (a) Seller does not warrant (and Purchaser's obligation to close hereunder shall not be conditioned upon) any lease, contract, occupancy contract, license or permit, inventory, personal property or supplies being in force or effect on the Closing Date or any other matter relating thereto, (b) in no event shall any change in facts occurring between the date hereof and the Closing Date with respect to any lease, contract, occupancy contract, license or permit, inventory, personal property or supplies affect, or constitute a condition precedent to, Purchaser's obligation to close hereunder.

13.23 <u>Designation Agreement</u>. Section 6045(e) of the Code and the regulations promulgated thereunder (herein collectively called the "<u>Reporting Requirements</u>") require an information return to be made to the United States Internal Revenue Service, and a statement to be furnished to Seller, in connection with the Transaction. Title Company ("<u>Agent</u>") is either (i) the person responsible for closing this transaction (as described in the Reporting Requirements) or (ii) the disbursing title or escrow company that is most significant in terms of gross proceeds disbursed in connection with this transaction (as described in the Reporting Requirements). Accordingly:

(A) Agent is hereby designated as the "<u>Reporting Person</u>" (as defined in the Reporting Requirements) for the Transaction. Agent shall perform all duties that are required by the Reporting Requirements to be performed by the Reporting Person for this transaction.

(B) Seller and Purchaser shall furnish to Agent, in a timely manner, any information requested by Agent and necessary for Agent to perform its duties as Reporting Person for this transaction.

(C) Agent hereby requests Seller to furnish to Agent Seller's correct taxpayer identification number. Seller acknowledges that any failure by Seller to provide Agent with Seller's correct taxpayer identification number may subject Seller to civil or criminal penalties imposed by law. Accordingly, Seller and Purchaser shall each deliver to Agent a completed and executed IRS Form W-9. The parties agree that Agent's failure to execute this Agreement shall not affect the effectiveness of this Agreement as between Seller and Purchaser and that if Title Company shall refuse to serve as the Reporting Person in accordance with the terms of this

Section, the parties shall, prior to the Closing, designate an alternative Reporting Person mutually acceptable to the parties.  The terms of this <u>Section 14.23</u> shall survive the Closing.

13.24  <u>Recitals</u>.  The Recitals set forth above are incorporated herein by this reference and shall comprise and integral and material part of this Agreement.

[The remainder of this page has been intentionally left blank.]

IN WITNESS WHEREOF, the parties to this Agreement have duly executed this Agreement as of the day and year first above written.

SELLER:

232 SEIGEL ACQUISITION LLC
a New York limited liability company

By:_____
Name: Toby Moskovits
Title: Authorized Signatory

PURCHASER:

232 Seigel Property, LLC,
a New York limited liability Company

By:_____
Name: Abraham Leifer
Title: Authorized Signatory

**IN WITNESS WHEREOF,** the parties to this Agreement have duly executed this Agreement as of the day and year first above written.

**SELLER:**

232 SEIGEL ACQUISITION LLC
a New York limited liability company

By:_____
    Name:  Toby Moskovits
    Title:  Authorized Signatory

**PURCHASER:**

232 Seigel Property, LLC,
a New York limited liability Company

By:_____
    Name:  Abraham Leifer
    Title:  Authorized Signatory

## Exhibit A

### LEGAL DESCRIPTION

All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly side of Seigel Street, distant 119 feet 6 inches westerly from the corner formed by the intersection of the southerly side of Seigel Street with the westerly side of White Street;

RUNNING THENCE, southerly parallel with White Street, 100 feet;

THENCE, westerly parallel with Seigel Street, 184 feet 11 1/2 inches;

THENCE, northerly parallel with White Street, 100 feet to the southerly side of Seigel Street;

THENCE, easterly along the southerly side of Seigel Street, 184 feet 11 1/2 inches to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as Block 3100, Lot 34, Kings County and also known as 232 Seigel Street, Brooklyn, NY 11206.

**Exhibit B**

## DEED RESTRICTION

[The Property] is being transferred subject to a covenant and restriction prohibiting the use of [the Property] as a homeless shelter or any transitional housing for the homeless or formerly homeless and [Purchaser] covenants, for itself and for its successors and assigns, that [the Property] shall never be used as a homeless shelter or any transitional housing for the homeless or formerly homeless. This covenant and restriction runs with the land and shall be binding upon all future owners of [the Property]. Any deed of conveyance of [the Property] or any portion thereof shall recite that said conveyance is subject to this covenant and restriction.

## Schedule 4

## Exceptions to Title: Title Matters

a)  $1 Condemnation Clause in Reel 878 Page 1786
b)  Easement in CRFN 2005000038670
c)  Covenants and Restrictions cited in Deed in CRFN 2005000038671
d)  Court Order in CRFN 2010000249407
e)  Easement as shown on tax map (affects PUE plus more)
f)  FOR INFO ONLY: Zoning Lot Certificate pursuant to Zoning Lot Subdivision C recorded in CRFN 2015000411555 (affects PUE plus more)
g)  FOR INFO ONLY: Zoning Lot Description and Ownership Statement recorded in CRFN 2015000411556 (affects PUE plus more)
h)  FOR INFO ONLY: Zoning Lot Certificate pursuant to Zoning Lot Subdivision D recorded in CRFN 2016000058111 (affects PUE plus more)
i)  FOR INFO ONLY: Zoning Lot Description and Ownership Statement recorded in CRFN 2016000058112 (affects PUE plus more)
j)  Declaration of Zoning Lot Restrictions recorded in CRFN 2016000058113 (affects PUE plus more)
k)  Waiver of Declaration of Zoning Lot Restrictions recorded in CRFN 2016000058114 (affects PUE plus more)
l)  Zoning Lot Development Agreement recorded in CRFN 2016000418068 (affects PUE plus more) (the "ZLDA")
m)  Easement Agreement recorded in CRFN 2016000418069 (affects PUE plus more) (the "Easement")
n)  Light and Air Easement Agreement recorded in CRFN 2017000363490

**CLOSING PRORATIONS/APPORTIONMENTS**

Section 1.    Adjustments.    Unless otherwise provided below, the following are to be adjusted and prorated between Seller and Purchaser as of 11:59 P.M. E.S.T. on the day preceding the Closing (the "Cut-Off Time"), based upon a 365 day year, and the net amount thereof under this Section shall be added to (if such net amount is in Seller's favor) or deducted from (if such net amount is in Purchaser's favor) the Purchase Price payable at Closing:

(a)    Real Estate Taxes.

(i)    All Real Estate Taxes levied against the Real Property shall be prorated as of the Cut-Off Time between Purchaser and Seller based on the respective periods of ownership of the Real Property by Purchaser and Seller during the applicable tax year.   Such proration shall be calculated on an accrual basis, based on the tax year in which Real Estate Taxes are levied against the Real Property.   All net tax refunds and credits attributable to any period prior to the Closing Date which Seller has paid or for which Seller has given a credit to Purchaser shall belong to and be the property of Seller.   All net tax refunds and credits attributable to any period on or subsequent to the Closing Date shall belong to and be the property of Purchaser.

(ii)    Seller shall pay all installments of special assessments ("Special Assessments") due and payable prior to the Closing Date, and Purchaser shall pay all installments of Special Assessments due and payable on and after the Closing Date; provided, however, that Seller shall not be responsible for any installments of Special Assessments which have not been confirmed or which relate to projects that have not been completed prior to the Closing Date.

(iii)    Subject to Section 7 of this Agreement, (1) all Real Estate Taxes and assessment refunds and credits received after the Closing by Seller shall be apportioned and paid to Purchaser to the extent such amounts relate to any period on or after the Closing Date and (2) all Real Estate Tax and assessment refunds and credits received after the Closing by Purchaser shall be apportioned and paid to Seller to the extent such amounts relate to any period prior to the Closing Date.

(iv)    Purchaser shall be solely responsible for any and all Real Estate Taxes, Special Assessments, changes in tax rate or assessed valuation arising out of the Transaction or occurring on or after the Closing Date; provided, however, that Seller shall be responsible for and shall pay all state and local transfer taxes relating to the transfer of title to the Real Property.

(v)    If the Closing shall occur before the mid-point of the applicable tax year, Purchaser shall have the right to conduct any applicable tax appeals and Seller shall execute and deliver such documents and otherwise provide such cooperation reasonably required by Purchaser in connection therewith.   If the

Closing shall occur after the mid-point of the applicable tax year and Seller shall fail to file for an appeal of the applicable Real Estate Taxes on or before thirty (30) days prior to the deadline for such filing, or shall thereafter fail to prosecute the appeal with commercially reasonable and diligent efforts, Purchaser shall have the right to take over the appeal and Seller shall execute and deliver such documents and otherwise provide such cooperation reasonably required by Purchaser in connection therewith.

(vi)     The appealing party's actual, reasonable, out-of-pocket costs and expenses of commencing and prosecuting any such appeal of the Real Estate Taxes for the tax year in which the Closing occurs shall first be deducted out of any refund or credit resulting from a successful appeal before making the allocations referred to above.

(b)     <u>Water and Sewer Charges, Utilities</u>.  All utility services shall be prorated as of the Cut-Off Time between Purchaser and Seller.  To the extent reasonably possible, readings shall be obtained for all utilities as of the Cut-Off Time.  If not possible, the cost of such utilities shall be prorated between Seller and Purchaser by estimating such cost on the basis of the most recent bill for such service; provided, however, that after the Closing, Seller and Purchaser shall re-prorate the amount for such utilities and pay between the parties (as applicable) any deficiency in the original proration to the other party promptly upon receipt of the actual bill for the relevant billing period.  Seller shall receive a credit for all deposits, if any, actually transferred to Purchaser or which remain on deposit for the benefit of Purchaser with respect to such utility contracts if same are assumed by Purchaser, otherwise such deposits shall be refunded to Seller.  The foregoing shall not affect Purchaser's right to open new accounts in Purchaser's name, which such accounts may provide for Purchaser to deliver a new deposit to the applicable utility company.

(c)     <u>Other</u>.  If applicable, the Purchase Price shall be adjusted at Closing to reflect the adjustment of any other item which, (i) under the explicit terms of this Agreement, is to be apportioned at Closing, or (ii) if not otherwise addressed herein, then is customarily prorated at the closing of similar transactions in the City of New York and State of New York.

Section 2.     <u>Intentionally Omitted</u>.

Section 3.     <u>Survival</u>.  The provisions of this <u>Schedule 7</u> and the obligations of Seller and Purchaser under this <u>Schedule 7</u> shall each survive the Closing for 6 months.

## Schedule 12.1.3

## Litigation

RICHARD RIVERA, Plaintiff,
-against-
232 SEIGEL AQUISITION LLC, S&B MOORE LLC, 215 MOORE ST ACQUISITION LLC, MINT DEVELOPMENT GROUP and YECHIAL LICHTENSTEIN, Defendants.

232 SEIGEL AQUISITION LLC - v. - THE TAX COMMISSION OF THE CITY OF NEW YORK, AND THE COMMISSIONER OF FINANCE OF THE CITY OF NEW YORK.

232 SEIGEL ACQUISITION LLC et al v. FORTRESS INVESTMENT GROUP LLC et al

Toby S. Moskovits et al v. Richmond Hill Investment Co. LP et al

Dunn Co. Safety LLC v. 232 Seigel Acquisition LLC et al

ISSM Protective Services Inc. - v. - The Williamsburg Hotel BK LLC et al

232 SEIGEL ACQUISITION LLC et al v. BRIDGECITY CAPITAL LLC et al

GREEN READY MIXX LLC v. ALL ISLAND MASONRY & CONCRETE INC. et al

**Schedule 12.1.5**

**<u>Tax Cert.</u>**

NONE

<u>**EXHIBIT C**</u>

<u>**TEMPORARY, NONEXCLUSIVE LICENSE, ACCESS AND INDEMNITY
AGREEMENT**</u>

This **TEMPORARY, NONEXCLUSIVE LICENSE, ACCESS AND INDEMNITY
AGREEMENT** (this "**Agreement**") is made as of May __, 2020 ("**Effective Date**"), by and
between 215 Moore St Acquisition LLC ("**Licensor**"), owner of the real property and building
located at _____ (the "**Licensor Property**") and 232 Seigel Property,
LLC. ("**Licensee**"), the owner of the real property and building located at 232 Seigel Street,
Brooklyn New York, Block: 3100, Lot: 34 (the "**Licensee Property**").

<u>WITNESSETH:</u>

**WHEREAS,** Licensee is constructing an eleven story hotel situated on the Licensee
Property (the "Project"); and

**WHEREAS,** Licensee, including its contractors, designers, and entities necessary, in
order to perform the Project, requires certain limited access and entry upon the Licensor Property
to (i) conduct a pre-construction survey of the Licensor Property (the "**Survey**"); (iii) protect the
land of the Licensor Property (the "**Overhead Protection**"); and (iv) install a sidewalk shed over
the public sidewalk in front of the property (the "**Sidewalk Shed**") (the Overhead Protection and
Sidewalk Shed shall be collectively referred to as the "**Protective Work**"), subject to the terms
and conditions set forth herein in accordance with the New York City Building Code (the
"**Code**") and New York City Department of Buildings (the "**DOB**").

**NOW, THEREFORE,** in consideration of the mutual covenants, representations and
agreements contained herein, the Licensee and Licensor hereby mutually agree as follows:

I.    THE LICENSE

Licensor grants Licensee a temporary, non-exclusive license to enter onto the necessary
portions of the Licensor Property to perform the Survey and install, maintain, and remove the
Protective Work in accordance with all applicable laws, rules, and regulations, including the
Code.  Such access shall be provided with at least three (3) business days' notice to Licensor or
at a mutually convenient time agreed upon with Licensor's managing agent.

II.   SURVEY

Licensee shall cause the Survey to be performed of the Licensor Property and the
building located thereon, and prior to installing the Protective Work, shall provide a copy of the
Survey report to Licensor for review. Licensor shall make all applicable common areas available
for observation and to the extent permitted by Licensor's tenants, the applicable apartments. The
Survey report shall include photographs and relevant information documenting the existing
conditions of the Licensor Property.

III.  SCOPE OF PROTECTIVE WORK

    (a)  <u>Overhead Protection</u>. Licensee shall install Overhead Protection in accordance with Code.

    (b)  <u>Sidewalk Shed</u>. Licensee shall install the Sidewalk Shed in accordance with Code. In addition, Licensee shall not store any materials on top of the Sidewalk Shed. It is further agreed that (i) the Sidewalk Shed shall not interfere with the ingress or egress to the Licensor Property, (ii) lighting, at Licensee's sole cost and expense, shall be maintained on the underside of the Sidewalk Shed, twenty-four (24) hours a day, seven (7) days a week, as per Code, (iii) Licensee shall implement any measures as reasonably requested by Licensor to ensure that the Sidewalk Shed does not compromise the safety and security of the residents of Licensor's building; (iv) the Sidewalk Shed shall not unreasonably obstruct Licensor's building's windows; and (v) during the time the Sidewalk Shed is in place, Licensee shall maintain the Sidewalk Shed in accordance with all legal requirements.

    (c)  <u>Additional Protections</u>. As required by law or as made necessary due to the Project, the parties mutually agree that the Protective Work may include the installation of additional protections at Licensee's sole cost and expense, which shall be disclosed in writing to Licensor in advance and include an estimated timetable, and subject to the same terms and conditions of this Agreement. Notwithstanding the foregoing, the installation of such additional protections shall be made only in accordance with the terms of this Agreement and with Licensor's approval, not to be unreasonably withheld and may justify the imposition of a monthly license fee in an amount reasonably determined by Licensor prior to installation of any such additional protections.

IV.  PERFORMANCE OF THE PROTECTIVE WORK/RULES/REGULATIONS

    (a)  The cost of performing the Protective Work, including any loss, liability, or damages caused by the Licensee, shall be borne solely by Licensee. Licensee shall be responsible for curing any damages caused by the Work to its pre-existing condition as documented by the Survey.

    (b)  The Protective Work shall be performed in a good, skillful, and workmanlike manner and in accordance with all applicable laws, rules and regulations, including, but not limited to, the Code and the requisite building permits.

    (c)  Licensee shall not perform any work that impacts the integrity of the Licensor Property's foundation, any load-bearing walls of the Licensor Property, and drainage affecting the building of the Licensor Property, without first submitting to Licensor a detailed description (the "Work Description Notice") of such proposed work, together with plans and specifications (which may be engineering drawings) for the proposed work, and the projected commencement date and completion date of such activity. Licensee shall submit the Work Description

Notice to Licensor at least fifteen (15) days prior to the commencement of the work contemplated by such Notice. In the event the proposed construction work is timely and reasonably objected to in accordance with the provisions hereof, Licensor and Licensee agree to cause their respective architects and/or engineers to promptly resolve in good faith any such construction related issues.

(d) No underpinning work, pile driving, or excavation requiring access to the Licensor Property shall be undertaken without the prior written consent of the Licensor, which consent may be withheld and/or conditioned at Licensor's sole discretion.

(e) The sidewalk in front of the building on the Licensor Property shall be kept free from obstructions and other tripping hazard at all times (to the extent arising from construction) and to clean debris in front of the building on the Licensor Property from the construction at the end of each working day.

(f) Licensee or its workforce shall not be permitted to utilize electricity emanating from or servicing any portion of the Licensor Property.

(g) No smoking shall be permitted by any of Licensee's workforce while on the Licensor Property.

(h) Licensee's workforce shall not be permitted to loiter on the sidewalk in front of the Licensor Property.

V.    COOPERATION

Licensee agrees to conduct the Protective Work in commercially reasonable manner calculated to minimize interference with the Licensor Property and inconvenience to the residents and guests of the Licensor Property beyond what is ordinarily contemplated as part of the Protective Work. Licensor agrees to reasonably cooperate with, and not interfere with or unreasonably delay, Licensee in the performance of the Protective Work and shall permit such reasonable access as may be appropriate so that Licensee may timely and efficiently perform the Protective Work. In the event of any issue, concern, or complaint as it relates to the Work, Licensor agrees to provide written notice first to the Licensee so that it may exercise all reasonable efforts to cure.

VI.    TERM

The term of this Agreement shall commence upon the Effective Date and expire on the earlier of (a) completion of construction of the Project that no longer requires any Protective Work on the Licensor's Property or (b) the thirty (30) month anniversary from the first installation of the Protective Work (the "**Expiration Date**").

VII.    INSURANCE & INDEMNITY

(a) Licensee shall secure, and keep in full force and effect throughout the completion of all work performed under this Agreement and substantial completion of the

Project, the following insurance coverages at Licensee's sole cost and expense, which coverage may be provided by contractors or subcontractors of Licensee in form reasonably acceptable to Licensor:

(i)   Commercial General Liability insurance, including contractual liability, products and completed operations liability, personal injury liability, written on an occurrence form, with combined bodily injury and property damage limits of liability of no less than $2,000,000 per occurrence; $4,000,000 per project general aggregate. The limits of liability can be provided in a combination of a Commercial General Liability policy and an Umbrella Liability Policy, which is written on Form CG00-01-07-98 or its equivalent and shall not include any exclusions or limitations other than those incorporated in the standard form. Such insurance is to be primary insurance, notwithstanding any insurance maintained by the Indemnitees;

(ii)  Worker's Compensation insurance providing statutory benefits for Developer's employees and employer's liability coverage, in an amount that is not less than $1,000,000.00;

(iii) Property coverage covering damage to, or loss of use of equipment or other property of the Licensor (included in (i) above); and

(iv)  The Commercial General Liability policies shall include Licensor and the Andrews Organization each as additional insured in connection with the activities contemplated by the scope of this Agreement to be stated explicitly on the certificate(s) of insurance.

(b)   All required insurance policies shall be maintained with insurance companies duly licensed by the State of New York and holding an AM Best Rating of no less than A-, VIII. Said policies shall contain a provision that coverage will not be canceled, non-renewed or materially changed, until at least thirty (30) days prior written notice has been provided to Licensor.

(c)   Certificates of customary form, i.e., Acord 25, evidencing all lines of coverage required pursuant to this Section of the Agreement, shall be delivered to Licensor prior to commencement of the Work. Similar certificates shall be delivered evidencing the renewal or replacement of such insurance, at least ten (10) days prior to the effective date of such renewal or change of insurer, if the access is not completed prior to expiration.

(d)   To the fullest extent permitted by law, Licensee hereby agrees to indemnify, hold harmless and defend the Licensor, its board of directors, shareholders, managing agent, and their successors and assigns (the "**Indemnitees**") from any of the following arising out of the Licensee's access to the Licensor Property or out of the Work performed by and/or on behalf of the Licensee: (i) any and all claims, damages, liabilities and expenses attributable to bodily injury and/or property damage on, in and/or about the Property and/or the Licensor Property; (ii)

violations of any state, local or federal laws, rules, codes, ordinances or orders, whether or not a written violation has been issued to the Licensor Property by the New York City Department of Buildings, New York City Landmarks Preservation Commission, the New York City Environmental Control Board and/or any other governmental and/or quasi-governmental agency or department; and (iii) costs and disbursements reasonably incurred as a result of and/or in connection with the above, including but not limited to attorneys', architects', engineers' and consultants' fees, costs and disbursements. The obligation to indemnify, hold harmless and defend as set forth herein shall not apply to the extent that any damage is caused by Licensor's willful acts and/or negligence, but shall survive the expiration, termination, assignment and/or full performance of this Agreement, final completion of the Work and other services provided pursuant to this Agreement.

(e)     In the event any action is brought against any Indemnitees for any reason relating to said identified matters relating to the Work, or if any Indemnitee is made a party to any litigation commenced by or against the Licensee arising therefrom, then, to the fullest extent permitted by law, the Licensee shall indemnify, defend and hold such Indemnitee harmless therefrom and shall promptly pay and discharge all claims (including, without limitation, attorney's fees and disbursements) emanating from or incurred in connection with such claims or action or litigation. The indemnity contained herein shall survive the termination of this Agreement. The Licensee and Indemnitee shall promptly advise each other in writing of any incident that might give rise to a claim or the service upon the Licensee or Indemnitee, as well as the service, including copies, of any summons, notices, letters or other communications upon them asserting or alleging any claim against either the Licensee or Licensor or with respect to any matter which is the subject of this Agreement, including, but not limited to, the indemnification provisions thereof.

## VIII.   RESPONSIBILITY FOR DAMAGE

In addition to and not in limitation of the foregoing, Licensee agrees to be responsible for any and all damage (the "**Damage**") sustained at or by Licensor Property, its occupants, invitees or employees as a result of the Protective Work. Licensee agrees to reimburse Licensor, within twenty (20) days of written demand, for the reasonable cost of any such Damage, including, but not limited to, the cost of restoring any such areas so damaged to the condition in which they existed prior to such Damage, which demand shall include a description of the Damage and such documentation as is reasonably necessary to support the cost of repairing or replacing same. This provision shall survive the expiration of this Agreement.

## IX.   MISCELLANEOUS

(a)     This Agreement constitutes the entire understanding between the parties relative to the Work. All of the recital paragraphs preceding Section I are hereby incorporated into the terms of this Agreement. This Agreement supersedes any prior verbal understanding or written agreement between the parties relative to the

subject matter hereof, and may not be amended, supplemented or discharged except by an instrument in writing signed by both parties. The parties agree that they have consulted and/or had an opportunity to consult with an attorney in entering into this Agreement.

(b)    This Agreement has been made in and shall in all respects be governed by, and interpreted and enforced pursuant to the laws of the State of New York without regard to conflicts of laws principles. Any litigation arising from this Agreement shall be venued in the Supreme Court located in the State, City and County of Kings.

(c)    If any provision of this Agreement shall be determined by any court having competent jurisdiction to be invalid, illegal or unenforceable, the remainder of this Agreement shall not be affected thereby but shall continue in full force and effect as though such invalid, illegal or unenforceable provision or provisions were not originally a part hereof.

(d)    No waiver by either party of any breach of a condition, term or provision of this Agreement shall be deemed to be a waiver of any preceding or succeeding breach of the same or of any other condition, term or provision hereof.

(e)    This Agreement may be executed in counterparts and a fax or .pdf copy of signatures shall be deemed originals for purposes of execution.

(f)    Licensee may not assign this Agreement without Licensor's prior written consent. The parties agree that in the event of any assignment, sale and/or transfer of the rights of the respective parties, any documents evidencing such assignment, transfer, and/or sale shall make reference to this Agreement and assignor shall notify the assignee, transferee, future owner or purchaser of the existence of this Agreement and take whatever actions are necessary to assure that such assignee, transferee, future owner or purchaser agrees to be bound by the terms herein. Any assignee hereunder shall be bound by the terms of this Agreement. Notwithstanding the foregoing, this Agreement shall be binding upon all tenants and shareholders of Licensor, and all successors, assigns, and subsequent purchasers of the parties' respective properties.

(g)    Licensor makes no representations or warranties as to the adequacy or suitability of the area which Licensee proposes to use and occupy for the performance of the Work and the completion of the project, nor as to the adequacy or sufficiency of Licensee's plans, drawings and specifications, regardless of Licensor's consent thereto or approval thereof, or the incorporation therein of any of Licensor's requirements or recommendations.

(h)    Any notice, statement, demand, consent, approval or other communication required or permitted to be given, rendered or made by either of the parties pursuant to this Agreement shall be in writing and shall be deemed to have been properly given, rendered or made when received, or delivery refused, if delivered

personally, or receipted hand or overnight air courier delivery service, to the following address:

| | |
|---|---|
| If to Licensor: | 215 Moore St Acquisition LLC<br>c/o Heritage Equity Partners<br>679 Driggs Avenue<br>Brooklyn, New York 11211<br>Attn: Toby Moskovits |
| With a copy to: | Cohen & Gresser LLP<br>800 Third Avenue<br>New York, New York 10022<br>Attn. Nicholas J. Kaiser, Esq.<br>nkaiser@cohengresser.com |
| If to Licensee: | 232 Seigel Property, LLC<br>1110 42nd Street<br>Brooklyn, New York 11219<br>Attn: Abraham Leifer<br>aleifer@aviewequities.com |
| With a copy to: | Kishner Miller Himes P.C.<br>40 Fulton Street, 12th Floor<br>New York, New York 10038<br>Attn: Ryan O. Miller, Esq.<br>rmiller@kishnerlegal.com |

(i)   Licensee hereby agrees that should Licensor or any affiliate or successor (collectively, "**Licensor Party**"), within twenty (20) years from the date of this Agreement, determine to perform work or demolition at the Licensor Property which, in Licensor Party's judgment, requires Licensor Party to perform any work at the Licensor Property similar to the Protection Work to be performed by Licensee as contemplated hereunder, then Licensee shall (or its successors) enter into a license and access agreement in favor of Licensor on terms and conditions substantially similar to those set forth in this Agreement. This Section IX(i) shall be binding upon Licensee's successors and assigns and shall be disclosed by Licensee in any sale of Licensee's Property.

Any notice other than a default or termination notice, or notice of like import, may be served only by e-mail, to the above e-mail address, with some proof of valid transmission and receipt retained by the sender for a reasonable period of time.

**\*SIGNATURE PAGE FOLLOWS\***

**IN WITNESS WHEREOF,** the parties hereto are authorized to and have executed this Agreement as of the Effective Date of this Agreement.

**215 Moore St Acquisition LLC, Licensor**

By: _____

      Name:

      Title:

**232 SEIGEL PROPERTY, LLC, Licensee**

By: _____

      Name: Abraham Leifer

      Title: Manager

## EXHIBIT A

Scope of the Work

1. Install, maintain, and remove Overhead Protection.
2. Install, maintain, and remove a Sidewalk Shed in front of the Licensor Property.
3. Access to the Licensor Property as necessary to document and inspect the status of the Protective Work, determine if any damage has been incurred to the Licensor Property, and/or to install, maintain, and/or remove any additional protections to the extent required by DOB.