# Exhibit A

# Original Lift Stay Motion

# Kristan Declaration

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

In re:                                                     Chapter 11

232 SEIGEL DEVELOPMENT LLC,                                Case No. 20-22844 (RDD)

                    Debtor.

------------------------------------------------------------x

In re:
                                                           Chapter 11
232 SEIGEL ACQUISITION LLC,
                                                           Case No. 20-22845 (RDD)
                    Debtor.

------------------------------------------------------------x

**DECLARATION OF STEPHEN KRISTAN**
**IN SUPPORT OF MOTION OF DB 232 SEIGEL LLC AND**
**DB 232 SEIGEL MEZZ LLC FOR RELIEF FROM THE AUTOMATIC STAY**

STEPHEN KRISTAN, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.  I am an employee of FIG LLC, which is an affiliate of DB 232 Seigel LLC ("*Senior Lender*") and DB 232 Seigel Mezz LLC ("*Mezz Lender*", and together with Senior Lender, the "*Lenders*"). Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge or upon my review of Lenders' business records.[1] If called upon to testify, I can and will testify competently to the facts set forth herein.

2.  I submit this declaration in support of the Lenders' motion (the "*Motion*"), pursuant to section 362(d) of chapter 11 of the Unites States Code (the "*Bankruptcy Code*") and Rule 4001-1 of the Local Bankruptcy Rules for the Southern District of New York (the "*Local*

---

[1] The Lenders' business records were made by, or from information transmitted by, a person with knowledge of the event described therein, at or near the time of the event described, and are kept in the ordinary course of the regularly conducted business activity of such person and the Lenders, and it is the regular practice of that business activity to make such records, and I have access to and routinely rely on the accuracy of these records in the ordinary course of performing my duties on behalf of the Lenders.

1

*Rules*"), for an order granting the Lenders relief from the automatic stay: (a) with respect to debtor 232 Seigel Development LLC ("*Development*"), to continue and conclude its stayed public sale, pursuant to section 9-610 of the Uniform Commercial Code (the "*UCC Article 9 Sale*") of Development's 100% equity ownership interest in 232 Seigel Acquisition LLC ("*Acquisition*" and together with the Development, the "*Debtors*"), and (b) with respect to Acquisition, to commence and prosecute the foreclosure of the Senior Loan Mortgage (defined herein) and obtain the sale of the Mortgaged Property (defined herein) pursuant to New York state law. As stated in greater detail below, relief from the automatic stay is warranted because the Debtors have not filed their chapter 11 petitions or plans of reorganization in good faith, and have no reasonable prospects for reorganizing within a reasonable period of time.

**Factual Background**

**A. The Project and the Loans**

3. Acquisition is the owner of vacant and undeveloped real property located at 232-244 Seigel Street, Brooklyn, New York (the "*Property*"), which was intended to be developed into a ten-story, full-service hotel (the "*Project*"). Development is the sole, 100% equity owner of Acquisition. An aerial photograph of the Property is attached hereto as <u>Exhibit A</u>.

**I. The Senior Loan and Indebtedness (Acquisition)**

4. On December 18, 2018, Acquisition executed and delivered a *Consolidated, Amended and Restated Secured Promissory Note* (the "*Senior Loan Note*") in the amount of $5,250,000.00 (the "*Senior Loan*") in favor of BridgeCity Capital LLC ("*BridgeCity*" or "*Original Senior Lender*"). Acquisition also entered into a *Loan Agreement* (the "*Senior Loan Agreement*") with Original Senior Lender that, among other things, required Acquisition to complete construction of the Project on the Property by October 18, 2019 (the "*Completion Date*").

2

5. On December 18, 2018, Acquisition executed and delivered a *Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents and Security Agreement* (the "*Senior Loan Mortgage*") to Original Senior Lender, securing payment of the indebtedness due under the Senior Loan Note. The Senior Loan Mortgage was recorded and filed in the Office of the City Register of the City of New York on January 14, 2019, CRFN No. 2019000014876. The Senior Loan Mortgage granted Original Senior Lender a mortgage on the Property, together with all, improvements, fixtures, equipment, furniture, personal property, accounts, contract rights, rents, issues, and profits located on or arising therefrom as more fully described therein (the "*Mortgaged Property*"). On or about January 10, 2019, the Original Senior Lender filed a UCC-1 financing statement with the State of New York, Filing No. 201901110016554, covering the Property and all related tangible and intangible personal property and fixtures on or attached to the Property as set forth in detail therein. The Original Senior Lender filed an additional UCC-1 property and fixture filing in Kings County, New York, File No. 2019011000074006001E4F92.

**II.    The Mezzanine Loan and Indebtedness (Development)**

6. In addition to the Senior Loan, on December 18, 2018, Development executed and delivered a *Mezzanine Promissory Note* (the "*Mezzanine Loan Note*" and together with the Senior Loan Note, the "*Notes*") in the amount of $3,000,000.00 (the "*Mezzanine Loan*", and together with the Senior Loan, the "*Loans*") in favor of BCC MZ17 LLC ("*Original Mezz Lender*" and together with Original Senior Lender, the "*Original Lenders*"). Development also entered into a *Mezzanine Loan Agreement* (the "*Mezzanine Loan Agreement*" and together with the Senior Loan Agreement, the "*Loan Agreements*") with Original Mezz Lender. Similar to the Senior Loan Agreement, the Mezzanine Loan Agreement required Development to complete construction of the Project by the Completion Date.

3

7. On December 18, 2018, Development executed and delivered a *Pledge and Security Agreement* (the "*Pledge and Security Agreement*") to Original Mezz Lender, securing payment of the indebtedness due under the Mezzanine Loan Note. The Pledge and Security Agreement granted Original Mezz Lender a security interest in the "Pledged Interests", which consisted of, among other things, "all membership interests or other equity interests of… [Acquisition]" (the "*Senior Borrower Equity Interest*"). Pursuant to the Pledge and Security Agreement, Development transferred physical possession of the Pledged Interests, including the share certificate representing the Senior Borrower Equity Interest, to Original Mezz Lender. In addition to taking physical possession of the Pledged Interests, out of an abundance of caution, on or about December 31, 2018, the Original Mezz Lender filed a UCC-1 financing statement with the State of New York, File No. 201812310622564.

### III.    The Assignments

8. On December 17, 2019, for value received, Original Senior Lender executed and delivered an *Assignment and Assumption Agreement* (the "*Senior Loan Assignment*") to Senior Lender, which assigned to Senior Lender all of Original Senior Lender's right, title, and interest in, among other things, all documents, instruments, and agreements relating to the Senior Loan as more fully described therein, including the Senior Loan Note, Senior Loan Agreement, and Senior Loan Mortgage (collectively, the "*Senior Loan Documents*").

9. In addition, on December 17, 2019, for value received, Original Mezz Lender executed and delivered to Mezz Lender an *Assignment and Assumption Agreement* (the "*Mezzanine Loan Assignment*" and together with the Senior Loan Assignment, the "*Assignments*"), which assigned to Mezz Lender all of Original Mezz Lender's right, title, and interest in, among other things, all documents, instruments, and agreements relating to the Mezzanine Loan as more fully described therein, including the Mezzanine Loan Note,

4

Mezzanine Loan Agreement, and the Pledge and Security Agreement (collectively, the "*Mezzanine Loan Documents*" and together with the Senior Loan Documents, the "*Loan Documents*"). Pursuant to the Mezzanine Loan Assignment, Original Mezz Lender transferred physical possession of the Senior Borrower Equity Interest to Mezz Lender.

10. Pursuant to the Assignments, Senior Lender is now the owner and holder of the Senior Loan Documents, and Mezz Lender is the owner and holder of the Mezzanine Loan Documents. The Senior and Mezzanine Loan Documents, pursuant to the terms thereof, together with Mezz Lender taking physical possession of the Senior Borrower Equity Interest, constitute valid first priority liens in favor the Lenders upon the Mortgaged Property and the Senior Borrower Equity Interest.

**IV.    Events of Default, Senior and Mezzanine Loan Maturity, and Maturity Payment Defaults**

11. The Debtors failed to complete construction on the Property on or prior to October 18, 2019, which constituted ongoing Events of Default under both the Senior and Mezzanine Loan Agreements.[2]

12. In addition to their project development obligations, the Debtors were obligated to pay all outstanding amounts owed under the Loans by January 1, 2020 (the "*Maturity Date*").

13. The Debtors failed to pay any amounts outstanding that became due under the Loans on the Maturity Date, which actions constituted an Event of Default under the Senior and Mezzanine Loan Agreements (the "*Maturity Payment Defaults*").

---

[2] The Debtors were in default under the Senior and Mezzanine Loan Agreements as early as October 18, 2019. On October 29, 2019, shortly after the Debtors failed to complete construction on the Property by the Completion Date as required by the Loan Documents, the Original Lenders sent notices to the Debtors notifying them of their defaults. The Original Lenders sent follow up notices of default by letters dated November 19, 2019 and December 27, 2019 (collectively, the "*Original Lender Notices of Default*"). The Debtors did not respond to the Original Lenders' correspondence.

5

14. In response to the Maturity Payment Defaults, on January 10, 2020, Senior Lender and Mezz Lender sent separate letters to the Debtors advising each of their failures to pay the full amounts due under the Loans by the Maturity Date as required by Section 8.1 of the Loan Agreements. As a consequence to these defaults, Senior and Mezz Lender demanded full payment of the entire balances due under the Loan Documents (the "*Acceleration Letters*").[3]

## B. The State Court Action

15. On January 9, 2020, shortly after the Debtors defaulted on their payment obligations, the Debtors filed a complaint (the "*Complaint*") in the Supreme Court of New York, Kings County, against Senior Lender, Mezz Lender, and the Original Lenders for certain alleged predatory lending actions taken by Original Lenders that in turn allegedly caused the Debtors to fail to complete the Project by the Completion Date. *See 232 Seigel Acquisition LLC et. al. v Fortress Investment Group et. al.*, Index No. 500693/2020 (the "*State Court Action*").[4]

16. On May 15, 2020, Senior Lender and Mezz Lender filed a Motion to Dismiss the State Court Action (the "*Motion to Dismiss*") on the grounds that the Debtors' allegations are entirely unfounded, conclusory, and prohibited by the various merger and anti-oral modification clauses in the Loan Documents. *See 232 Seigel Acquisition LLC et. al. v Fortress Investment Group et. al.*, Index No. 500693/2020, Doc. No. 7 (Supreme Court, N.Y. Cnty, May 15, 2020). Rather than opposing the Motion to Dismiss, the Debtors purported to voluntarily discontinue the State Court Action *without prejudice* on July 6, 2020. That discontinuance is a nullity, however,

---

[3] The Original Lenders also further expressed that the Debtors remain in default since October 2019 relating to their failure to finish construction of the Project by the Completion Deadline.

[4] The Debtors essentially allege that the Original Lender prevented them from obtaining a construction loan and also from consummating a sale of the Property, which in turn prevented the Debtors from completing construction on the Property. The Debtors allege that sole motivation behind the Original Lender's actions was to "thwart the sale of the Property and foreclose." In addition, the Debtors allege that the Lenders colluded with the Original Lender, and purchased the Loans from the Original Lender for the sole purpose of foreclosing on the Property.

6

given that New York law bars a plaintiffs' right to discontinue an action upon a defendant's filing of a motion to dismiss.

### C. Mezz Lender's Exercise of Remedies Under UCC Article 9 Against Development's Ownership Interest in Acquisition

17.    As a consequence of the Maturity Payment Defaults and pursuant to the Mezzanine Loan Documents and the UCC, on March 3, 2020, Mezz Lender gave written notice to Development that it would be selling the Pledged Interests (including the Senior Borrower Equity Interest) by public sale pursuant to section 9-610 of the Uniform Commercial Code as enacted in the State of New York (the "*UCC*"). The UCC Article 9 Sale was initially scheduled to occur on April 7, 2020 at 11:00 a.m. (E.T.).

18.    In furtherance of the UCC Article 9 Sale, Mezz Lender engaged Newmark & Company Real Estate Inc. ("*Newmark*") as Mezz Lender's exclusive marketing agent and broker in order to maximize the value of the Pledged Interests being sold. Among other things, beginning on March 3, 2020 Newmark conducted an extensive marketing process of the Pledged Interests, which included electronic advertisements that reached tens of thousands of potential investors. Newmark also coordinated a weekly advertisement of the Foreclosure Sale in the New York Post which ran the advertisement for four consecutive weeks with the final ad running on March 24, 2020.

19.    While the UCC Article 9 Sale was originally scheduled for April 7, after the imposition of Statewide lockdown orders the Mezz Lender adjourned the sale at the end of March to a new date of May 5, 2020, and notified the Debtors that the sale had been adjourned. At the end of April, Mezz Lender again adjourned the sale to a new date of June 23, 2020, and informed the Debtor of the new date.

20.    On June 3, 2020, Mezz Lender again adjourned the UCC Article 9 Sale to July 14, 2020 and issued the First Amended and Restated Terms of Public Sale, stating that the sale

would be conducted via audio/video teleconference rather than in-person. Mezz Lender informed the Debtors that it would be moving forward with the UCC Article 9 Sale telephonically on July 14, 2020, at approximately 11:00 a.m. (prevailing Eastern Time).

21. In addition to the previous advertisements in the New York Post, two additional advertisements were published in the New York Post on June 5, 2020 and June 12, 2020. On July 14, 2020, Mezz Lender was in the process of preparing to move forward with the UCC Article 9 Sale as scheduled when it received a notification that the Debtors had filed for relief under chapter 11 of the Bankruptcy Code. No prospective bidders attended the UCC Article 9 Sale prior to the sale being postponed by virtue of the Debtors' bankruptcy filings. Further, Mezz Lender was not made aware of any bidders who had expressed interest in acquiring the Pledged Interests prior to the UCC Article 9 Sale.

**D. The Debtors' Bankruptcy Filings**

22. On July 14, 2020, approximately thirty minutes prior to the commencement of the UCC Article 9 Sale, each of the Debtors filed for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "*Court*"). In its Petition for Voluntary Relief ("*Petition*"), Development elected to file under Subchapter V of chapter 11 and define itself as a Subchapter V "debtor" pursuant to Bankruptcy Code § 1182(1).[5] Acquisition elected to define itself as a debtor engaged in the business of owning Single Asset Real Estate as defined in Bankruptcy Code § 101(51B).

23. As of the Petition Date, the Debtors owed the Lenders approximately $10.3 million in connection with the Loans, inclusive of principal, interest, fees, and expenses.

---

[5] On August 28, 2020, the Lenders filed an objection to Development's designation as a Subchapter V debtor because Development is a member of a group affiliated debtors whose collective secured and unsecured debts exceed the threshold required by the Bankruptcy Code [ECF. No. 23].

8

24. On July 15, 2020, Development filed its Schedules of Assets and Liabilities, Schedules A/B, D, E/F, and Summary of Assets and Liabilities [ECF No. 3] (the "*Schedules*"). In its Schedules, Development described itself as having $3,000,000 in outstanding secured liabilities and $1,836,408.27 in unsecured liabilities, totaling $4,836,408.27 in outstanding debts. *See* Schedules, Summary of Assets and Liabilities. Development filed Amended Schedules on August 27, 2020, and September 9, 2020 [ECF Nos. 21, 29] (the "*Amended Schedules*"), increasing its total non-priority unsecured claims to $6,621,852.37.

25. Attached to its Voluntary Petition for Relief, Acquisition filed its Schedules of Assets and Liabilities, Schedules A/B, D, E/F, and Summary of Assets and Liabilities. *See* Acquisition Petition [ECF No. 1]. In its Summary of Assets and Liabilities, Acquisition described itself as having, among other things, $5,250,000 in outstanding secured debts and $1,836,408.27 in unsecured debts, totaling $7,112,316.65 in outstanding obligations.[6] Acquisition also filed Amended Schedules on August 27, 2020 [ECF No. 18]. Acquisition also filed Amended Schedules, amending its Schedules E/F and increasing its liability for non-priority unsecured claims to $6,411,926.65 [ECF No. 18].

26. Notwithstanding $25,908.38 in outstanding priority claims owed to the NYC Department of Finance, the unsecured obligations listed in Acquisition's Schedules are identical to those described in Development's Schedules. No unsecured obligation described in either Debtors' Schedules is listed as being incurred after 2016.

27. On August 14, 2020, the Debtors each filed their Schedules G and H, along with their Statements of Financial Affairs [ECF Nos. 14, 17, respectively] (the "*SOFAs*"). In its Schedule H, Development listed Acquisition as a co-debtor liable for all of the general unsecured

---

[6] While the Debtors have not disclosed any outstanding real property tax liabilities on their Schedules, a review of publicly available records reveals that approximately $6,208.49 in taxes are due and owing in connection with the Mortgaged Property. Payments were due in January and April of 2020, respectively.

9

trade and operating liabilities listed on its Schedule E/F. Both Debtors described themselves as have no income or revenues whatsoever. *See* SOFAs, Part 1.

28. On August 28, 2020, the Lenders filed and served their *Objection of DB 232 Seigel LLC and DB 232 Seigel Mezz LLC to Subchapter V Debtor Election under 11 U.S.C. § 1182(1)* (the "Objection"). In the Objection, the Lenders assert that Development incorrectly classified itself as a Subchapter V "Debtor" and therefore, notwithstanding the relief sought in this Motion, is required to proceed with its bankruptcy case under the ordinary chapter 11 provisions of the Bankruptcy Code.

### E. The Debtors' Plans

29. On August 27, 2020, the Debtors filed joint chapter 11 plans of reorganization [ECF Nos. 19, 22, respectively] (the "*Plans*"). Acquisition's Plan generally provides for a sale of the Mortgaged Property free and clear of all liens and interests for $18 million pursuant to a purchase and sale agreement (the "*PSA*") which was executed on February 26, 2020, by and between Acquisition and 232 Seigel Property, LLC (the "*Purchaser*"). Acquisition's Plan contemplates the assumption of the PSA, as well as a market-testing of the PSA through an auction process pursuant to bidding procedures attached to Acquisition's Plan as Exhibit A (the "*Bidding Procedures*").

30. The Bidding Procedures require all-cash bids for the Mortgaged Property and do not clearly permit credit bidding or discuss credit bidding in any manner. Without naming the Purchaser as a stalking horse bidder, the Bidding Procedures establish the minimum, opening bid at $18 million with $50,000 increments. The Debtors also "reserve [the] right to withdraw the Property from the Sale, either prior or subsequent to the Sale, for any reasonable reason, as the [Debtors deem] necessary or appropriate."

31. The PSA contains a time-of-the-essence provision which required closing to occur by May 21, 2020. PSA § 2.3. The PSA also required the Purchaser to deliver a down payment to Acquisition in the amount of $1.8 million by February 27, 2020 (the "*Down Payment*"). PSA § 2.2. Based upon the Debtors' Schedules, SOFAs, and other financial filings, the Down Payment was never made, or was subsequently returned to the purchaser. The PSA also provides, among other things, as a condition of closing that Acquisition "has not…(ii) filed any voluntary petition in bankruptcy." PSA § 6.1(c), 12.1.16. The PSA does not contain any provisions which subject the PSA to higher and better offers, an auction process, or bankruptcy court approval.

32. Development's Plan is a five-page document that acts as a waterfall distribution mechanism upon the closing of the sale of the Mortgaged Property. Based upon the $18 million sale described in the PSA, the Acquisition Plan contemplates a $6,202,990 distribution to Development as the sole equity holder of Acquisition (the "*Equity Distribution*") after full payment to Acquisition's secured, administrative, priority, and general unsecured creditors. Thereafter, Development would distribute the cash representing the Equity Distribution to Development's creditors in accordance with the Development Plan's treatment of its respective classes.

33. The Acquisition Plan provides for a distribution to Senior Lender in the amount of $5,250,000, the principal amount of the Senior Loan, but does not account for the additional amounts owed to Senior Lender as of the Petition Date in connection with the Debtors' Maturity Payment Default. The Development Plan does not quantify the distribution that would be made to Mezz Lender, but instead provides that Mezz Lender will be paid "the sale proceeds the Debtor receives from the sale of the Property under the Acquisition plan up to the allowed

11

amount of [the Lenders'] claim." In both Plans, the Lenders are deemed an impaired class and is entitled to vote to accept or reject the Plans.

### The Automatic Stay Must be Lifted
### In Both Acquisition's and Development's Chapter 11 Cases

34. I am informed by counsel that 11 U.S.C. § 362(d) provides relief from the automatic stay, which may be obtained "for cause", or where there is no possibility that a plan of reorganization can be confirmed within a reasonable amount of time. I respectfully submit that "cause" exists in the instant case because the Debtors did not commence their chapter 11 cases in good faith and their Plans as filed are not capable of confirmation, thus warranting relief from the automatic stay.

35. A review of the Debtors' Petitions and Schedules reveals that the Senior Borrower Equity Interest is Development's sole asset, and the Mortgaged Property is Acquisition's sole asset. The Debtors' Schedules and Amended Schedules reveal that the Debtors have minimal legitimate unsecured creditors, whose claims are in *de minimis* amounts when compared to the Lenders' $8+ million secured claims. It is unclear whether the Debtors legitimately even owe such debts to the unsecured creditors described in their Schedules and Amended Schedules as (i) the unsecured claims in Development's Schedules are identical to those listed in Acquisition's Schedules, (ii) the Debtors dispute every unsecured debt listed in their Schedules and Amended Schedules, (iii) no unsecured debt listed in either Debtors' Schedules has been incurred more recently than 2016, and (iv) the Debtors are not a party to a single executory contract at this time, other than the PSA which is in default. Given the questions surrounding the legitimacy of these unsecured claims, the Lenders are potentially the only creditor in these chapter 11 cases.

36. Development's sole asset is the subject of the UCC Article 9 Sale as a result of substantial arrearages on the Lenders' secured debt and the Debtors' failure to complete the Project by the required deadline. The Debtors' bankruptcy filing, therefore, is the result of a

two-party dispute that the Debtors were litigating in state court and conceded when they voluntarily discontinued the State Court Action. There is no reasonable explanation for the Debtors' chapter 11 cases other than to invoke the automatic stay to stop the UCC Article 9 Sale.

37. I am informed by counsel that, as discussed in greater detail in the accompanying *Memorandum of Law in Support of Motion of DB Seigel 232 LLC and DB 232 Seigel Mezz LLC for an Order Granting Relief from Automatic Stay*, it is well-settled law in the Second Circuit that the above facts alone support a determination that the Debtors commenced their chapter 11 cases in bad faith, and that the Lenders are entitled to relief from the stay in consequence. I am also informed by counsel that the Debtors' Plans as filed are incapable of confirmation given that they are, among other things, premised upon the assumption of a contract that is the subject of a material and incurable breach, and that the Debtors have no other viable means by which they can confirm any other chapter 11 plans of reorganization within a reasonable time.

38. Moreover, other factors that support this conclusion include that the Debtors (i) have non-existent cash reserves or cash flow, (ii) cannot meet their current expenses, including its debt service, and (iii) have no realistic possibility of confirming a feasible plan (or plans) of reorganization within a reasonable period of time.

[*Remainder of Page Intentionally Left Blank*]

13

### Conclusion

WHEREFORE, for the foregoing reasons, I respectfully request that this Court (i) grant the Lenders relief from the automatic stay to (a) permit the continuance and conclusion of the UCC Article 9 Sale, (b) permit the Lenders to commence the foreclosure of the Senior Loan Mortgage and the sale of the Mortgaged Property, and (c) permit the Lenders to exercise all other rights as the Debtors' sole secured creditor including, without limitation, by the foreclosure and sale of the Senior Borrower Equity Interest and Mortgaged Property; and (ii) grant such other and further relief as may be just and proper.

September 21, 2020

_____
STEPHEN KRISTAN